BLACKMORE PARTNERS,
L.P., Plaintiff,

v.

LINK ENERGY LLC, J. Robert Chambers, Julie H. Edwards, Thomas M. Matthews, Robert E. Ogle, James M. Tidwell, S. Wil Vanloh, Jr., and Daniel J. Zaloudek, Defendants.

C.A. No. 454–N.

Court of Chancery of Delaware,
New Castle County.

Submitted: Nov. 1, 2004.
Decided: Nov. 10, 2004.

Norman M. Monhait, Esquire, Jessica Zeldin, Esquire, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; Stephen T. Rodd, Esquire, Stephanie D. Amin–Giwner, Esquire, Rebecca A. Scheinberg, Esquire, Abbey Gardy· LLP, New York, New York, Attorneys for the Plaintiff.

Srivinas M. Raju, Esquire, Elizabeth C. Tucker, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware; David D. Sterling, Esquire, Samuel W. Cooper, Esquire, Robeca Aizpuru, Esquire, Baker

Botts LLP, Houston, Texas, Attorneys for the Defendants.

## *OPINION*

LAMB, Vice Chancellor.

A former equity unit holder of a solvent limited liability company brings this purported class action suit against the company and directors for breach of fiduciary duty in connection with a transaction that rendered the equity units worthless. The complaint alleges that the directors breached their fiduciary duties by approving (as they were authorized to do without a vote of the unit holders) a sale of substantially all the company's assets in a transaction that resulted in the distribution to the company's creditors of 100% of available funds in an amount that exceeded the total amount of their claims. The plaintiff also alleges that the defendants violated their fiduciary duties by failing to consider alternative transactions that would have provided a better result for the company's equity holders.

The defendants have moved to dismiss the complaint for failure to state a claim upon which relief can be granted, in accordance with Rule 12(b)(6) of the Court of Chancery Rules. The question presented is whether a complaint that does not contain specific allegations that a majority of the directors were either interested in the transaction or lacked independence may nevertheless survive a motion to dismiss on the basis of a permissible inference that the actions of the directors amounted to a breach of the duty of loyalty. The court holds that the well-pleaded allegations of fact found in the complaint, if true, could support a reasonable inference of disloyal conduct. This is all that is required to survive a motion to dismiss.

## I.

### A. The Parties[1]

Link Energy LLC is a Delaware limited liability company formed in November of 2002, in anticipation of assuming and continuing the business of EOTT Energy Partners, L.P. upon its emergence from bankruptcy. Link, and EOTT Energy Partners before it, engaged in the purchasing, gathering, transporting, trading, storage and resale of crude oil and related activities.

In October of 2002, EOTT Energy Partners filed for Chapter 11 restructuring in the United States Bankruptcy Court for the Southern District of Texas. As part of the restructuring plan approved by the bankruptcy court, EOTT Energy Partners' publicly traded common units were cancelled and its former common unit holders received equity units in Link representing 3% of Link's newly issued equity units. Moreover, as part of the restructuring, EOTT Energy Partners cancelled $235 million of its outstanding 11% senior unsecured notes in exchange for which the holders received a pro rata share of $104 million in 9% senior unsecured notes issued by Link and a pro rata share of the Link equity units. The remaining equity units were distributed to other allowed unsecured creditors.

The seven individual defendants, J. Robert Chambers, Julie H. Edwards, Thomas M. Matthews, Robert E. Ogle, James M. Tidwell, S. Wil VanLoh, Jr., and Daniel J. Zaloudek, comprise Link's board of directors (the "Director Defendants"). Matthews is Chairman of the board and CEO

1. Unless otherwise noted, the facts recited in this opinion are taken from the well-pleaded allegations of the amended complaint.

of Link. Chambers, Edwards, Ogle, Tidwell, VanLoh, and Zaloudek were elected to Link's board pursuant to the terms of the bankruptcy restructuring.[2]

Plaintiff Blackmore Partners, L.P. is a Delaware investment partnership. Blackmore beneficially owned 16,239 Link equity units through March 16, 2004 and remains a unit holder.

## B.  The Sale Of Link's Assets

At the time the company emerged from bankruptcy, its capital structure was highly leveraged. According to periodic statements made by Link, business forecasts were not being met and the company's high cost of capital was putting it at a competitive disadvantage. Therefore, Link's management and board announced that they were considering alternatives to continuing operation and engaged Lehman Brothers Inc. as an advisor. In March 2004, Link agreed to sell its assets and business to Plains All American Pipeline, L.P. for $290 million. Under the terms of the Link LLC operating agreement the board of directors had the power to effectuate that transaction without a vote of unit holders. Link has now sold substantially all of its assets, ceased all of its principal business, and is in the process of winding up.

On March 16, 2004,[3] Link issued a press release regarding the late filing of its 10–K report, due on March 31, 2004. In its press release, Link disclosed that it was in negotiations to sell all of its operating assets, and that any proceeds would be used to pay its creditors. The press release reported that the proposed transaction required of Link's board of directors and the board of directors of the buyer and continued:

> Based on current projections, the company's management believes that its unit holders would receive a minimal amount, if any, after payment of, or otherwise making provision for, all of its liabilities, obligations and contingencies, which are substantial. There can be no assurance, however, that there will be any funds to distribute to unit holders.[4]

The day following the press release, Links units traded at $1 per unit, down from over $5 per unit. Before they were eventually stopped regular trading, the units traded at, or below, $0.20.

According to the amended complaint, after Link's March 16 announcement, certain unit holders who were not also 9% note holders, including a representative of the plaintiff, contacted Link to discuss an alternative transaction to avoid the asset sale. This so-called "Alternative Proposal," which is described only in the most conclusory terms, allegedly would have involved an infusion of equity into the company that would have allowed Link to remain independent, obviating the need to redeem the 9% notes. The amended complaint also alleges in a conclusory fashion that ChevronTexaco was "willing and eager" to take over some of Link's market-

---

**2.**  The amended complaint alleges that Edwards is the Executive Vice President of Frontier Oil Company. As of March 31, 2004, Frontier owned 23,700 shares of Prudential Company of America, one of the holders of the 9% notes. These facts do not raise a reasonable inference that Edwards was not an independent, disinterested director.

**3.**  The amended complaint recites the content of the March 16, 2004 press release at length.

*See McMillan v. Intercargo Corp.,* 768 A.2d 492, 500 (Del.Ch., 2000) ("In analyzing a motion to dismiss, the court may consider, for carefully limited purposes, documents integral to or incorporated into the complaint by reference.").

**4.**  Pl.'s Am. Class Action Compl. ("Compl.") ¶ 25.

ing activities, which were limited by Link's inability to obtain substantial letters of credit for such activities. This relationship with ChevronTexaco would allegedly have been extremely beneficial to Link, allowing it to increase its revenue while improving its balance sheet. After receiving the Alternative Proposal, Link's management communicated that Link would not do anything without first discussing a transaction with the plaintiff and other unit holders.

On March 31, 2004, without any further contact with the plaintiff or the other unit holders, Link made public in a press release its sale of assets to Plains.[5] According to the press release, Link was to receive $290 million in consideration: $273 million in cash from Plains and the assumption of certain obligations, and $17 million in cash from Texas New Mexico Pipe Line Company, a wholly owned subsidiary of Shell Pipeline Company, in consideration for settling outstanding litigation with that company. From these proceeds, $265 million of the $290 million was to be used to repay debt, including the 9% notes. However, in addition to the value of the principal and the accrued interest, the 9% note holders also received their pro rata share of the $25 million remaining from the sale of Link's assets. This $25 million kicker was in return for the note holders waiving cove-

nants in the notes that required any purchaser of the Link's assets to assume the notes.[6] The March 31 press release stated: "The potential premium is in exchange for the senior note holders' waiver and modification of certain provisions of the notes, including the right to have Plains assume the notes, and approximates the premium on the notes reflected by the estimated market value if Plains had assumed the notes."[7] The press release also restated the belief of Link's board, later confirmed, that the unit holders would receive no distributions under the sale.[8]

The press release does not say that Link was on the verge of returning to insolvency, nor does it say that maintenance of the status quo was untenable. Instead, it states that "[t]his sale is in Link Energy's long-term best interest in order to protect the value of the assets, the needs of our customers, and the jobs of our employees."[9] The press release does not address any concern for the interests of the common unit holders, the value of whose interest in Link was wiped out by the transaction.

## II.

On May 5, 2004, Blackmore filed this purported class action suit against Link and the Director Defendants for breach of

5. The complaint incorporates the March 31, 2004 press release by reference. *See supra* note 2.

6. Compl. ¶ 32 states, in pertinent part:
The holders of approximately 89% of the outstanding senior notes have agreed to sell their notes to Link Energy for 100% of the principal and accrued interest, subject to the closing of the transaction. The other holders of the senior notes will be offered the right to resell their notes on the same terms. Senior note holders that sell their notes to Link Energy on these terms will also receive their proportionate share of up

to $25 million from any funds, including funds released from the escrow, that may remain after Link Energy makes provision for its outstanding liabilities, obligations and contingencies.

7. Compl. ¶ 32.

8. Compl. ¶ 32, states, in pertinent part: "Based on current projections, the Company believes that it is likely that there will not be any liquidating or other distributions to the holders of Link Energy's LLC units."

9. Compl. ¶ 32.

fiduciary duty. On June 15, 2004, all of the defendants filed a motion to dismiss pursuant to Court of Chancery Rule 12(b)(6). On August 2, 2004, Blackmore filed its amended class action complaint.

In the amended complaint, Blackmore alleges that the board members violated their fiduciary duties owed to Link's equity holders by approving the sale of substantially all of Link's assets to Plains. The amended complaint raises two distinct, but related, claims. First, it alleges that Link's board favored the 9% note holders, to whom they did not owe a fiduciary duty, at the expense of the unit holders, to whom they did owe a fiduciary duty. Specifically, the amended complaint alleges that the board violated its fiduciary duty by approving the distribution of the $25 million excess consideration to the 9% note holders. As alleged in the amended complaint: "In approving the distribution, the [Director Defendants] deployed the LLC's power against its unit holders, failed to act with a rational basis and failed to act in good faith with regard to the unit holders. This distribution plan constitutes a breach of duty owed to plaintiff and the Class by defendants." [10] Second, the plaintiff alleges that the board failed to maximize unit holder value in a sale of control transaction and, therefore, violated its duty of loyalty under *Revlon.*

On August 18, 2004, the defendants renewed their 12(b)(6) motion to dismiss.

They allege that the plaintiff has failed to state a claim upon which relief can be granted. They argue that, since Link's LLC Operating Agreement [11] contains an exculpatory clause based on 8 *Del. C.* 102(b)(7), claims for breach of the duty of care are barred.[12] Furthermore, the defendants argue that, to sustain a claim for breach of the duty of loyalty, the plaintiff bears the burden of pleading facts sufficient for this court to infer that the board's decision was motivated by self-interest, lack of independence or bad faith, and that the plaintiff has failed to meet that burden. Therefore, they argue, the plaintiff's action should be dismissed.

## IV.

The standard for dismissal pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted is well established. The motion will be granted if it appears with reasonable certainty that the plaintiff could not prevail on any set of facts that can be inferred from the pleading.[13] In considering a motion to dismiss under Rule 12(b)(6), the court is required to assume the truthfulness of all well-pleaded allegations of fact in the complaint.[14] All facts of the pleadings and inferences that can reasonably be drawn therefrom are accepted as true.[15] However, neither inferences nor conclusions of fact unsupported by allegations of specific

10. Compl. ¶ 36.

11. In a motion Rule 12(b)(6) motion to dismiss, the court may consider, for certain purposes, the content of documents that are integral to or are incorporated by reference into the complaint; e.g. the provisions of the certificate of incorporation or, in this case, the LLC Operating Agreement. *In re Lukens Inc. Shareholders Litig.,* 757 A.2d 720, 727 (Del. Ch.1999).

12. This provision is authorized by 6 *Del. C.* § 18–1101(c)(2), which provides that a manager's "duties and liabilities may be expanded or restricted by provisions in the limited liability company agreement."

13. *Kohls v. Kenetech Corp.,* 791 A.2d 763, 767 (Del.Ch.2000).

14. *Grobow v. Perot,* 539 A.2d 180, 188 n. 6 (Del.1988).

15. *Id.*

facts are accepted as true.[16] That is, a trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in the plaintiffs' favor unless they are reasonable inferences.[17]

## V.

■■■■ Once a board of directors determines to sell the corporation in a change of control transaction, its responsibility is to endeavor to secure the highest value reasonably attainable for the stockholders.[18] This obligation is a contextually-specific application of the directors' duty to act in accordance with their fiduciary obligations, and there is no single blueprint that a board must follow to fulfill its duties.[19] Rather, the board's actions must be evaluated in light of the relevant circumstances to determine whether they were undertaken with due diligence and in good faith.[20] If no breach of duty is found, the board's actions are entitled to the protections of the business judgment rule.[21]

As Vice Chancellor Strine pointed out in *McMillan v. Intercargo Corp.*, the presence of the exculpatory clause in the LLC Agreement:

> ... has an important, but confined, influence on the court's analysis of this motion. Because the plaintiff[ ] may not recover damages for a breach of the duty of care by the defendant directors, the court's focus is necessarily upon whether the complaint alleges facts that, if true, would buttress a conclusion that the defendant directors breached their

duty of loyalty or otherwise engaged in conduct not immunized by the exculpatory charter provision.[22]

Thus, to survive the motion to dismiss, the complaint must allege particularized facts that support an inference of disloyalty or a lack of good faith.[23]

The defendants claim that the plaintiff has failed to allege such facts because the complaint makes no substantial allegations about the motivation of the board. The defendants argue that since the plaintiff has not alleged any particularized facts of self-interest or lack of independence by the Defendant Directors, the complaint does not adequately allege a breach of the duty of loyalty or "acts or omissions not in good faith." While the absence of well-pleaded allegations of self-interest or lack of independence often is, as was true in *McMillan*, a fatal defect in a claim for breach of the duty of loyalty, that is not invariably the case.

The complaint alleges, and for purposes of this motion the court assumes as true, that the Director Defendants approved a transaction that disadvantaged the holders of Link's equity units. Until the announcement of the transaction, the units had significant, if not substantial, trading value. Indeed, there is a basis in the complaint to infer that the value of Link's assets exceeded its liabilities by least $25 million. Moreover, the facts alleged support an inference that Link was neither insolvent nor on the verge of re-entering bankruptcy. Yet, as a result of the trans-

16. *Id.*

17. *Lukens*, 757 A.2d at 727.

18. *McMillan*, 768 A.2d at 502 (citing *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 182 (Del.1986)).

19. *McMillan*. 768 A.2d at 502 (internal citations omitted).

20. *Id.*

21. *Id.*

22. *Id.* at 501.

23. *Lukens*, 757 A.2d at 734 n. 38.

action at issue, those units were rendered valueless.

In the circumstances, the allegation that the Defendant Directors approved a sale of substantially all of Link's assets and a resultant distribution of proceeds that went exclusively to the company's creditors raises a reasonable inference of disloyalty or intentional misconduct. Of course, it is also possible to infer (and the record at a later stage may well show) that the Director Defendants made a good faith judgment, after reasonable investigation, that there was no future for the business and no better alternative for the unit holders. Nevertheless, based only the facts alleged and the reasonable inferences that the court must draw from them, it would appear that no transaction could have been worse for the unit holders and reasonable to infer, as the plaintiff argues, that a properly motivated board of directors would not have agreed to a proposal that wiped out the value of the common equity and surrendered all of that value to the company's creditors.

In an analogous case, Chancellor Allen recognized "[t]he broad principle that if directors take action directed against a class of securities they should be required to justify" their action.[24] Thus, while on a more complete record, it may appear that the Director Defendants took no such action or were justified in acting as they did, this court cannot now conclude that the complaint does not state a claim for breach of the duty of loyalty or other misconduct not protected by the exculpatory provision in Link's operating agreement. For this reason, the Rule 12(b)(6) motion to dismiss must be denied.

### VI.

For the foregoing reasons, the defendants' motion to dismiss pursuant to Rule 12(b)(6) is DENIED. IT IS SO ORDERED.

---

**24.** *Orban v. Field,* 1993 WL 547187, at *9 (Del.Ch. Dec. 30, 1993).