Wachovia Capital Partners, LLC v. Frank Harvey Inv. Family Ltd. P'ship, 2007 NCBC 7

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
05 CVS 20568

WACHOVIA CAPITAL PARTNERS, LLC,
BANC OF AMERICA CAPITAL
INVESTORS SBIC L.P., JAMES M. HALL,
JEFFREY A. DAVIS, LAKELAND
HOLDINGS, LLC, and JOHN SHIMP as
Sellers' Representative

Plaintiffs,

v.

FRANK HARVEY INVESTMENT FAMILY
LIMITED PARTNERSHIP,

Defendant.

ORDER

{1}     This case arises out of Plaintiffs' suit for declaratory judgment and breach of contract brought against Defendant.  These matters come before the Court on (1) Plaintiffs' motion to dismiss counterclaims, (2) Defendant's motion to join additional counterclaim defendants, (3) Plaintiffs' motion for protective order, (4) Defendant's first motion to compel, and (5) Defendant's second motion to compel.

{2}     After considering the briefs and oral arguments, the Court (1) GRANTS in part and DENIES in part Plaintiffs' motion to dismiss counterclaims, (2) DENIES Defendant's motion to join additional counterclaim defendants, (3) GRANTS Plaintiffs' motion for protective order, (4) DENIES Defendant's first motion to compel, and (5) DENIES Defendant's second motion to compel.

*Kennedy Covington Lobdell & Hickman, L.L.P. by Kiran H. Mehta, Sara W. Higgins, and Theodore A. Kaplan for Plaintiffs Wachovia Capital Partners, LLC, Banc of America Capital Investors SBIC L.P., James M. Hall, Jeffrey A. Davis, Lakeland Holdings, LLC, and John Shimp as Sellers' Representative.*

*Rayburn Cooper & Durham, P.A. by G. Kirkland Hardymon; Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C. by Mark C. Hansen, Kevin B. Huff, Bertrand-Marc Allen,*

*and Robert A. Klinck; Nistico & Crouch, P.C. by Joseph F. Nistico, Jr. and M. Micah Kessler for Defendant Frank Harvey Investment Family Limited Partnership.*

Tennille, Judge.

## I.

## PROCEDURAL BACKGROUND

{3} This action was filed in Mecklenburg County Superior Court on November 14, 2005. The matter was designated a complex business case and assigned to the undersigned Special Superior Court Judge for Complex Business Cases by order of the Chief Justice of the Supreme Court of North Carolina dated February 3, 2006.

{4} Defendant filed a motion to join additional counterclaim defendants on March 2, 2006. Defendant filed a motion to compel on March 24, 2006. Plaintiffs filed a motion for protective order on March 29, 2006. Plaintiffs filed a motion to dismiss counterclaims on May 1, 2006. The Court heard oral arguments on these motions on June 21, 2006. Defendant filed a second motion to compel on August 31, 2006.

## II.

## THE PARTIES

{5} Plaintiff Wachovia Capital Partners, LLC ("WCP") is a limited liability company organized and existing under the laws of the state of Delaware, with its principal place of business located in Charlotte, North Carolina.

{6} Plaintiff Banc of America Capital Investors SBIC L.P. ("BACI") is a limited partnership organized and existing under the laws of the state of Delaware, with its principal place of business located in Charlotte, North Carolina.

{7} Plaintiff James M. Hall ("Hall") is a citizen and resident of the Commonwealth of Virginia. At times relevant to this action, he was chief executive officer and a manager of Lakeland Holdings, LLC ("Lakeland"), and a member of Lakeland's Management Committee.

{8} Plaintiff Jeffrey A. Davis ("Davis") is a citizen and resident of the Commonwealth of Virginia. At times relevant to this action, he was Lakeland's chief financial officer and a manager of the Lakeland LLC.

{9} Plaintiff Lakeland Holdings, LLC is a limited liability company organized and existing under the laws of the state of Delaware, with its principal place of business located in Charlottesville, Virginia.

{10} Plaintiff John Shimp is a citizen and resident of the state of North Carolina, and is joined in this matter solely in his capacity as sellers' representative.

{11} Defendant Frank Harvey Investment Family Limited Partnership ("FHP") is a limited partnership organized and existing under the laws of the state of Texas, with its principal place of business in Houston, Texas.

III.

PLAINTIFFS' MOTION TO DISMISS COUNTERCLAIMS

A.

FHP'S ALLEGATIONS

{12} Defendant alleges the following facts in its counterclaim:

{13} Frank Harvey ("Harvey") is the general partner of FHP. Harvey helped found and manage a company called American Student Travel ("AST"). AST was in the business of providing chaperoned trips for students to Washington, D.C. and New York City. (Countercl. ¶ 21.) AST was a principal competitor of another company, Lakeland Tours, in the educational tour industry. Lakeland Tours was "one of the nation's largest providers" of commercially organized student tours. (*Id.* ¶ 18.) In the late 1990s, the educational tour industry was "highly fragmented." (*Id.* ¶ 19.) Working with WCP, Lakeland Tours sought to consolidate the industry by acquiring its competitors. (*Id.*) For this purpose, Lakeland Tours and WCP formed Lakeland Holdings, LLC. WCP was the controlling member of the LLC. (*Id.* ¶ 20.)

{14} It was in this business environment that Harvey sold AST to Lakeland. Harvey became co-chairman of Lakeland, and FHP became a member of the LLC. (*Id.* ¶ 23.) By the fall of 2001, Harvey was no longer co-chairman and FHP had no role in the management of Lakeland.[1] (*Id.* ¶ 24.) Control of the LLC rested with WCP and BACI. Together they held a

---

[1] As described in more detail below, Frank Harvey's son, Lance Harvey, is also in the educational tours industry. He was a member of Lakeland's Management Committee until November of 2000, and is presently a partner in FHP and the principal of Student Tours of America, a competitor of Lakeland. *See infra* ¶ 50.

majority of the equity interests in the LLC and a majority of the seats on the Management Committee.[2] (*Id.* ¶ 25.)

{15} Defendant alleges that over the next few years, Lakeland's merger activities resulted in financial difficulties and an inability to pay debts. When Lakeland began to miss debt payments to WCP, BACI, and their affiliates, the LLC entered into various amendments and waivers of condition in its credit agreements with those banks. This gave WCP and BACI an even greater degree of control over Lakeland. (*Id.* ¶ 29.) Lakeland also fell behind on its debts to FHP. FHP became concerned over the missed payments and over certain marketing and distribution agreements ("exclusive use agreements") that Lakeland had with teachers. FHP demanded an inspection of Lakeland's books and records but was denied access. (*Id.* ¶ 30–32.)

{16} In late October of 2005, Lakeland notified FHP that it had negotiated a buyout. The LLC would be sold for approximately $217 million to WorldStrides Holdings, LLC, a subsidiary of Charlesbank Capital Partners, LLC. (*Id.* ¶ 36.) FHP learned that Charlesbank was acting in conjunction with James Cook, a former Wachovia partner and a member of Lakeland's Management Committee. (*Id.* ¶ 37.)

{17} FHP received a purchase agreement for review at the beginning of November 2005. The buyout price had declined to $210 million, allegedly as a result of "transactions Lakeland engaged in simultaneous to the buyout to the benefit of Company insiders." (*Id.* ¶ 38.) An example of such a transaction is an agreement that Lakeland insiders would not be cashed out, but would rather be able to exchange their Lakeland equity for WorldStrides equity in a "rollover." (*Id.* ¶ 39C.) The purchase agreement also required that FHP represent and warrant that Lakeland "had disclosed to the buyers all material contracts, was in compliance with all applicable laws, and had not made, directly or indirectly, any illegal gift, contribution, or payment." (*Id.* ¶ 41.) The agreement further required FHP to indemnify the buyer if any of the representations and warranties were later found to be to be untrue. (*Id.*)

{18} FHP declined to sign the purchase agreement and requested information regarding the transaction. It tried to get rollover rights for itself (*id.* ¶ 45A) and continued to be concerned that Lakeland's exclusive use agreements ("EUAs") with teachers were in many ways illegal. (*Id.* ¶ 48.) November 15, 2005 was the deadline by which FHP was to execute the deal documentation. (*Id.* ¶ 62.) The deadline passed and the documents went unexecuted by FHP. Shortly after the

---

[2] In the counterclaims and briefs, the Management Committee is also referred to as the "board."

deadline, the other members of the LLC decided not to proceed with the original deal. The transaction was instead restructured as a merger. (*Id.* ¶ 67; *see infra* § III.C.3.)

{19} Based upon these allegations, FHP presents the Court with the following seven counterclaims:

1. Ultra vires corporate conduct
2. Breach of fiduciary duties
3. Declaratory judgment
4. Breach of duty of good faith
5. Conversion and continuing breach of fiduciary duties
6. Aiding and abetting breach of fiduciary duties
7. Bad faith—punitive damages

## B.

## LEGAL STANDARD

### 1.

### MOTION TO DISMISS

{20} Plaintiffs have moved to dismiss Defendant's counterclaims for "[f]ailure to state a claim upon which relief can be granted" under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. N.C. R. Civ. P. 12(b)(6). For purposes of a Rule 12(b)(6) motion to dismiss, the Court must treat the allegations in Defendant's counterclaims as if they were true. *See, e.g.*, *Hyde v. Abbott Labs.*, 123 N.C. App. 572, 575, 473 S.E.2d 680, 682 (1996). Furthermore, the Court may not consider "extraneous matter" outside the counterclaims, or else the Rule 12(b)(6) motion will be converted into a Rule 56 motion for summary judgment. *See, e.g.*, *Fowler v. Williamson*, 39 N.C. App. 715, 717, 251 S.E.2d 889, 891 (1979). However, the Court may consider documents the moving party attaches to a 12(b)(6) motion which are the subject of the challenged pleading and specifically referred to in that pleading, even though they are presented to the Court by the moving party. *See Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60, 554 S.E.2d 840, 847 (2001) (considering a contract on a 12(b)(6) motion even though the contract was presented by the movant). The Court is not required to accept as true "any conclusions of law or unwarranted deductions of fact." *Id.* at 56, 554 S.E.2d at 844. Thus the Court can reject allegations that are contradicted by the supplementary documents presented to it. *See E. Shore*

*Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000) (stating that the court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments").

2.

THE BUSINESS JUDGMENT RULE IN DELAWARE

{21}   As noted above, Lakeland is a Delaware LLC governed by the Delaware Limited Liability Company Act ("the Act").  (Am. Compl. ¶ 5.)  Section 18-402 of the Act allows the founders of a Delaware LLC to provide for the management of their company in the LLC agreement.[3]  Del. Code Ann. tit. 6, § 18-402 (LEXIS through 2006 legislation).  Here, section 6.1 of Lakeland's Third Amended and Restated Limited Liability Company Agreement vests management, operation, and control in a Management Committee, whose acts are binding on the LLC.  Thus, the decision to enter into a merger or other consolidation transaction is for the Management Committee and is subject to review under the business judgment rule.  *See Blackmore Partners, L.P. v. Link Energy, LLC*, 864 A.2d 80, 85–86 (Del. Ch. 2004) (applying the business judgment rule to the decision of directors of an LLC to approve the sale of the LLC).

{22}   The business judgment rule recognizes that business decisions are best left in the hands of informed and experienced boards of directors and managers.  Courts, while expert at interpreting and applying the law, "are ill equipped to engage in post hoc substantive review of business decisions."  *In re The Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 746 (Del. Ch. 2005).  The rule thus "serves to protect and promote the role of the board as the ultimate manager of the corporation" and prevents courts from unreasonably imposing themselves on the affairs of a corporation.  *Id.*  The business judgment rule is a "standard of judicial review," James D. Cox & Thomas Lee Hazen, *Corporations*  § 10.01 at 184 (2d ed. 2003), and presumes that "in making a business decision the directors of a corporation acted on an informed basis . . . and in the honest belief that the action taken was in the best interests of the company."  *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).  However, the presumption only applies if the directors took steps to adequately inform themselves about the transaction at issue.  *See Smith v. Van Gorkom*, 488 A.2d 858, 889 (Del. 1985).  Furthermore, the presumption "can be rebutted by a showing that the board violated one of its fiduciary duties in connection with the challenged

---

[3] Otherwise, management is vested in the members.  Del. Code Ann. tit. 6, § 18-402 (LEXIS through 2006 legislation).  *See generally* Larry E. Ribstein, *Unincorporated Business Entities* § 12.08, at 364–69 (2d ed. 2000) (discussing management of limited liability companies).

transaction." *Emerald Partners v. Berlin*, 787 A.2d 85, 91 (Del. 2001). If the presumption is successfully rebutted, "the burden shifts to the director defendants to demonstrate that the challenged transaction was 'entirely fair' to the corporation and its shareholders." *Id.*

{23} In order to successfully rebut the presumption of the business judgment rule, the Court must be presented with more than bare allegations of breaches of fiduciary duties on the part of the directors. To survive a motion to dismiss, the counterclaims here "must allege, in other than conclusory terms, that the board was inattentive or uninformed, acted in bad faith, or that the board's decision was unreasonable." *Winters v. First Union Corp.*, 2001 NCBC 8 ¶ 17 (N.C. Super. Ct. July 13, 2001), http://www.ncbusinesscourt.net/opinions/2001%20NCBC%2008.htm. Absent these specific allegations, "the board's decision is entitled to a presumption of reasonableness and plaintiff must specifically plead facts which would overcome that presumption." *Id.*

C.

ANALYSIS

{24} Defendant's counterclaims contain allegations of several conflicts of interest. The Court must determine whether Defendant has alleged these conflicts with sufficient specificity to strip Plaintiffs of the protection of the business judgment rule. In general, Defendant alleges that:

> Wachovia and Banc of America (and the Lakeland insiders controlled by these parties) sought a buyout that would maximize the return of their total investment – the equity and the debt that was held by them and their affiliates – regardless of the effect that a buyout structured to maximize their return would have on equity investors who did not have similarly large outstanding credit facilities with Lakeland.

(Countercl. ¶ 34.) More specifically, FHP alleges that the following created conflicts of interest on the part of Plaintiffs:

> (A) An agreement to accelerate vesting for equity awards available to insiders and to remove performance triggers for those awards;
>
> (B) An agreement to buy back at par value Lakeland debt held by Wachovia, Banc of America, and their affiliates out of the proceeds generated by the buyout;

(C) An agreement with the buyers that Lakeland LLC insiders would have the right to exchange their existing Lakeland equity for equity in Worldstrides (a rollover), rather than receiving cash for their existing equity without the buyout.

(*Id.* ¶ 39.)   Regarding the merger transaction that ultimately took place, Defendant alleges that "[c]ompany insiders, including Hall and Davis, stood on both sides of the deal."  (*Id.* ¶ 67.)

{25}   The Court will address each of these in turn.

1.

## ACCELERATED VESTING OF EQUITY AWARDS

{26}   The "equity awards" at issue here are actually "Restricted Units," or nonvoting common units.  Under section 3.7 of the LLC Agreement[4], these Restricted Units are to be awarded to LLC members who are employees of the company.  The Management Committee is also given discretion to award Restricted Units to any employee of the company.  Fifty percent of the Restricted Units were set to vest on given "anniversary dates."   Under the Second Amendment to the LLC Agreement, dated October 2005, fifty percent of these would vest if the buyout went through, regardless of the anniversary dates when they were set to vest under the original agreement.

{27}   It is true, as FHP alleges, that the accelerated vesting of equity awards was available to insiders—LLC members who were also employees—such as Hall and Davis.  However, the accelerated vesting was also a benefit to other employees who were not LLC members.  Moreover, the amendment allowing accelerated vesting was approved by two thirds of Lakeland's equityholders (namely WCP, BACI, and Hall).  WCP and BACI were not employees of Lakeland and gained nothing from the awarding of Restricted Units to certain employees.  Indeed, the accelerated vesting of equity awards served to decrease the share of WCP, BACI, and Hall.  The employees were the primary beneficiaries of this program, and Defendant has not alleged any specific facts to indicate that Plaintiffs breached their fiduciary duties by making such awards available.

2.

## DEBT REPAYMENT PROVISIONS

---

[4] The LLC Agreement is referred to in the counterclaim and is thus properly before the Court on a motion to dismiss.  (*See* Countercl. ¶ 5.)

{28} Defendant next alleges that certain debt repayment features of the transaction unfairly benefited WCP and BACI. Defendant more specifically refers to "[a]n agreement to buy back at par value Lakeland debt held by WCP, BACI, and their affiliates out of the proceeds generated by the buyout." (Countercl. ¶ 39.) These allegations of wrongdoing are contradicted by information in the transaction documents.

{29} The Court assumes that the "affiliates" of WCP and BACI are Wachovia Bank, N.A. and Bank of America, N.A. However, these two institutions collectively held less than twenty percent of Lakeland's senior debt and were part of a larger syndicate of lenders. (*See* App. to Pls.' Mem. Supp. Mot. Dismiss Countercls. 496.) The debt repayment was a benefit not only to the affiliates of WCP and BACI, but all of Lakeland's creditors, including FHP as a holder of junior debt.

{30} The transaction documents reveal nothing particularly unusual about the agreement to repay Lakeland's debt at par value. At the time of the transaction, Lakeland had $67 million in debt but was worth $210 million. (*See* App. at 124, 127, 221.) Lakeland was not in danger of defaulting on its loans, and it stands to reason that the debt would be repaid at par—not only to WCP and BACI's affiliates but also to holders of junior debt such as FHP. Documents properly before the Court indicate that FHP's debt was also repaid at par (App. at 368A–D), further diminishing any allegations of unfair treatment.

{31} Lending agreements often call for acceleration and payment upon a change in control of a debtor company. This is a common feature of modern transactions, and FHP has not alleged specific facts that the debt repayment features of the transaction under scrutiny were nefarious or only to the benefit of a select group of creditors with representatives inside the company.

3.

ROLLOVER RIGHTS AND MERGER TRANSACTION

{32} The accelerated vesting of equity award and debt repayment provisions were features of both the abandoned buyout and the merger as ultimately consummated. Regarding the merger, FHP broadly alleges that "the Investors [Charlesbank, WorldStrides, and Cook] . . . agreed to a merger with the Company in which Company insiders, including Hall and Davis, stood on both sides of the deal." (Countercl. ¶ 67.) The deal was governed by a document known as the "Amended Purchase Agreement." FHP alleges that "[u]nder the Amended

Purchase Agreement[5] the Investors and Company insiders, including Counter-Defendants Hall, Davis, and Shimp, formed a new entity, Worldstrides." (*Id.* ¶ 68.) "Then, the Company redeemed all its members (including Harvey Investment, and over its objection) except for Wachovia and Banc of America. Next, Worldstrides (*i.e.*, the Investors' and Company insiders' new entity) was merged into Lakeland. Worldstrides paid merger consideration to Lakeland, which Wachovia and Banc of America, as the last remaining original members of the Company withdrew in exchange for forfeiture of their equity interests. The withdrawal of Wachovia and Banc of America left Lakeland's equity interest in the hands of the Investors and the original Company insiders." (*Id.*)

{33} The transaction documents properly before the Court contradict some of these allegations. First, Lakeland's partner for the merger was not WorldStrides. Rather, it was "Merger Sub." The Lakeland Management Committee described Merger Sub as "a newly-formed limited liability company whose members are the Buyer and the Rollover Members." Memorandum from Mgmt. Comm. of Lakeland Holdings, LLC to Members of Lakeland Holdings, LLC 1 (Dec. 2, 2005). The "Buyer" was WorldStrides Holdings, LLC (*id.*), a subsidiary of Charlesbank Capital Partners, LLC (Countercl. ¶ 36).[6] The Rollover Members were Lakeland equityholders who were allowed to "roll over" their Lakeland equity into equity in the new entity. The only Rollover Members who are also a party to this lawsuit are Hall and Davis. (First Am. to Membership Interest Purchase and Redemption Agreement, Schedule B, Dec. 2, 2005.) WCP and BACI did not have any rollover units and were not Rollover Members.

{34} The Court must test this information from the transaction documents against FHP's allegation that Lakeland insiders stood on both sides of the transaction and thereby violated their fiduciary duties to FHP. The documents show that WCP and BACI were only on the selling side of the transaction. They were members of Lakeland but held no rollover units and were not Rollover Members of Merger Sub. FHP alleges that Shimp was a member of Lakeland's merger partner,[7] or at least had a hand in its formation. Shimp was one of BACI's representatives on the Lakeland Management Committee. However, he held no interest in Lakeland personally, and

---

[5] FHP's reference to the Amended Purchase Agreement in its counterclaims allows the Court to review and consider this document on Plaintiffs' motion to dismiss. (*See* Countercl. ¶ 68.)

[6] FHP has alleged that "Charlesbank was acting in conjunction with James Cook—a member of the Wachovia partnership as recently as 2002" and a member of Lakeland's board. (*See* Countercl. ¶ 37.)

[7] FHP refers to this entity as WorldStrides. But as noted above, Lakeland ultimately participated in a transaction with an entity known as Merger Sub.

BACI was completely cashed out in the merger transaction. Thus BACI did not stand on both sides of the central transaction. FHP also seems to allege that WCP stood on both sides of the transaction through James Cook, a *former* member of Lakeland's Management Committee and *former* Wachovia partner who was connected to Charlesbank, a member of Merger Sub. Mr. Cook was not a Wachovia partner or a member of Lakeland's Management Committee at the time of the transaction. And as was the case with BACI, WCP's interest in Lakeland was completely extinguished in the course of the merger. Thus FHP has plead no facts to indicate that WCP and Cook stood on both sides of the transaction.

{35} The Court next turns to the allegation of conflict on the part of Plaintiffs Hall and Davis. Hall was an officer of Lakeland and a member of its Management Committee. Davis was an officer and manager of the company. The transaction documents indicate they held rollover interests and were members of Merger Sub in their capacity as Rollover Members. Thus they stood on both the buying and selling sides of the transaction.

{36} FHP was not disadvantaged by the rollover provisions of the purchase agreement. First, the transaction documents show that on a pro rata basis, Rollover Members received the same value for their interests as non-Rollover Members. The only difference was in the form of the consideration paid. Rollover Members received equity in the new company, and non-Rollover Members—including FHP, WCP, and BACI—received cash for their Lakeland equity units. There are no allegations that other non-Rollover Members, i.e. those investors most similarly situated to FHP, got a sweeter deal than FHP. FHP has not alleged that the cash it received was inadequate compensation for its Lakeland equity units. Moreover, the only members of Lakeland who were allowed to rollover their equity interests were members of Lakeland's management. This arrangement does not strike the Court as unusual. Lakeland was merging with Merger Sub, which consisted of Charlesbank and the Rollover Members. In their brief, Plaintiffs correctly characterize Lakeland's buyer as a "financial buyer." Without the Rollover Members, Lakeland's buyer had no experience in the educational tours industry. By allowing managers such as Hall and Davis to roll over, the new company was assured an experienced management team.

{37} The mere presence of managers on both sides of a merger does not mean the transaction must fail due to a conflict of interest. In *McMillan v. Intercargo Corp.*, 768 A.2d 492 (Del. Ch. 2000), the Delaware Court of Chancery faced a situation similar to the one before this

Court. The *McMillan* plaintiffs attacked the decision of the selling company's CEO, who was also a director, to sell the company. "According to the plaintiffs, [the CEO and director] was motivated to support a subpar deal . . . because [the buyer] promised him future employment." *Id.* at 502. Here, Hall is similarly accused of sitting on both sides of a deal. Vice Chancellor Strine dismissed the complaint against the director in *McMillan* in part because "[t]he plaintiffs do not even allege that the CEO was hired . . . on terms materially more favorable than his (apparently non-threatened) employment." FHP does not even go so far as to specify those types of allegations against Hall and Davis. Rather, there is a bare allegation that they "stood on both sides of the transaction." The Court finds no conflict in the rollover provisions of the purchase agreement and finds that although Hall and Davis stood on both sides of the transaction, FHP has not plead sufficient facts to overcome the presumption of the business judgment rule and survive a motion to dismiss. Rather, FHP's effort is to make something sinister out of a perfectly normal business transaction.

{38} The transaction documents also establish that the merger was approved by ninety-five percent of Lakeland's equityholders. The Delaware courts have made clear that such a "fully informed vote of stockholders approving a merger will extinguish a claim for breach of fiduciary duty" against directors. *In re Lukens Inc. S'holders. Litig.*, 757 A.2d 720, 737 (Del. Ch. 1999); *see also Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1176 (Del. 1995) ("where a majority of fully informed stockholders ratify action of even interested directors, an attack on the ratified transaction normally must fail"). FHP has alleged that the transaction was "conflicted" (Countercl. ¶ 69) but has not alleged facts to indicate that the equityholders who approved the transaction were uninformed.

{39} Lastly, the Court will address FHP's request for injunctive relief in its first, second, fourth, fifth, and sixth counterclaims restoring it "to a position equivalent to the *status quo ante*." (*See, e.g.*, *id.* ¶ 76.) This would have the effect of restoring FHP as an equityholder in the new Lakeland entity. Yet in its counterclaims, FHP alleges that Lakeland's use of exclusive use agreements with teachers "implicates a number of commercial bribery and other laws and regulations." (Countercl. ¶ 59.) Indeed, FHP refused to go along with the original transaction because of its unwillingness to warrant that Lakeland was not involved in any illegal activities. (*Id.* ¶ 48.) The Court is quizzical as to why FHP would ask to be restored to ownership in a company it contends is in violation of "a number" of laws and presumably subject to liability for

those violations on a massive scale.[8]  It would also be impractical for the Court to insert FHP into the new Lakeland after more than a year of operations and an existing debt structure.  FHP's request for injunctive relief is simply not supported by law or economic reality.

{40}   The decisions of the Lakeland Management Committee surrounding the transactions at issue here are thus entitled to the protection of the business judgment rule under Delaware law, and the Court will not upset those decisions.  The Management Committee chose to pursue a buyout, and when the buyout fell through, they had the right to restructure the transaction as a merger.  FHP's counterclaims for ultra vires corporate conduct, breach of fiduciary duties, declaratory judgment, breach of duty of good faith, aiding and abetting breach of fiduciary duties, and bad faith—punitive damages are accordingly dismissed.

4.

CONVERSION COUNTERCLAIM

{41}   Plaintiffs' motion to dismiss the conversion counterclaim as to Lakeland is denied. While Lakeland may have rights to retain funds under the Escrow Agreement, the conversion counterclaim may be read broadly enough to allege that FHP is entitled to the sums under the Escrow Agreement and that the funds have been wrongfully withheld.  The counterclaim does fail to state a claim against Shimp individually.

IV.

FHP'S MOTION TO JOIN CHARLESBANK CAPITAL PARTNERS, LLC, CHARLESBANK EQUITY FUND V, LP, CHARLESBANK EQUITY FUND VI, LP, AND WORLDSTRIDES HOLDINGS, LLC AS ADDITIONAL COUNTERCLAIM DEFENDANTS

{42}   FHP has moved the Court to join the Charlesbank and WorldStrides entities to the First, Third, and Sixth Counterclaims seeking relief for ultra vires corporate conduct, declaratory judgment, and aiding and abetting breach of fiduciary duties.  In light of the Court's dismissal of these counterclaims, FHP's motion to join is denied as moot.

V.

PLAINTIFFS' MOTION FOR ENTRY OF PROTECTIVE ORDER

---

[8] *See supra* note 1.  Continued membership in Lakeland would provide FHP with some degree of access to Lakeland's business information.

{43}   The Court grants Plaintiffs' motion for entry of protective order.  The protective order is filed contemporaneously with this Order.

## VI.

## DEFENDANT'S FIRST MOTION TO COMPEL PLAINTIFFS TO PRODUCE DOCUMENTS AND ANSWER INTERROGATORIES

### A.

### BACKGROUND

{44}   As described above, this case relates to transactions involving Lakeland Holdings, LLC.  FHP was a member of Lakeland and a party to Lakeland's Third Amended and Restated Limited Liability Company Agreement ("LLC Agreement").  Under section 10.5 of the LLC Agreement, members are obligated to participate in certain sales of the company.  If certain conditions are met, a member must "take all necessary and desirable actions in connection with the consummation of any Approved Sale, including the execution of such agreement and instruments and other actions reasonably necessary to (1) provide the representations, warranties, indemnities, covenants, conditions, escrow agreements and other provisions and agreements relating to such Approved Sale and (2) effectuate the allocation and distribution of the aggregate consideration upon the Approved Sale."

{45}   Plaintiffs allege that FHP breached this provision of the LLC Agreement by not executing the purchase agreement for the original buyout transaction.  The purchase agreement required members to represent and warrant that Lakeland had not engaged in illegal conduct, had not made illegal payments to any supplier or government employee, and had disclosed all material contracts to the prospective buyers.  FHP did not execute the purchase agreement "based on its belief that Lakeland had engaged in a certain form of contracting—entering into Exclusive Use Agreements with teachers—that was illegal, anticompetitive, and violated various state ethics rules."  (Def.'s Brief Supp. First Mot. Compel 4)  Ultimately, Lakeland abandoned the buyout and restructured the transaction as a merger.

### B.

### THE PRESENT DISCOVERY DISPUTE

{46}   Defendant's discovery requests to Plaintiffs included the following interrogatory and requests for production of documents, to which Plaintiffs object:

**Interrogatory Number 17**
For each form of contract produced or referenced in the preceding Interrogatory [referring to Exclusive Use Contracts], state the dates between which that form of contract was used, all states in which teachers subject to that form of contract lived during the time that that form of contract was in force, the number of contracts executed in each state, and whether any of the contracts executed in each such state is still in force.

**Request for Production Number 7**
Executed Exclusive Use Agreements

**Request for Production Number 8**
Company documents pertaining to the Exclusive Use Agreements or the Company's use of them.

**Request for Production Number 9**
Documents showing disclosures the Company made to parents, teachers, students, or school districts regarding the Exclusive Use Agreements.

Company documents relating to the Company's disclosure or lack thereof of Exclusive Use Agreements.

**Request for Production Number 10**
Documents showing legal communications relating to the Exclusive Use Agreements and their legality, disclosure, and the Company's potential liability therefore [sic].

**Request for Production Number 11**
Documents showing any communications between the Company (and its agents) and any government entity in regards to the use, legality or propriety of the Company's Exclusive Use Agreements.

**Request for Production Number 12**
Documents showing any communications between the buyers and the Company, its members, and its agents relating to any of the documents listed in the above requests.

**Request for Production Number 18**
Any and all communications or correspondence between the Company, any of its Members or any person on the Management Committee and the Buyer relating to the contracts requested in Request for Production Number 7.

C.

LEGAL STANDARD

{47} This dispute is governed by Rule 26 of the North Carolina Rules of Civil Procedure, which sets forth the permissible scope of discovery. Under Rule 26,

> [p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party . . . . It is not ground for objection that the information sought will be inadmissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence . . . .

N.C. R. Civ. P. 26(b)(1).

{48} A fundamental requirement of Rule 26, and the focus of the Court's analysis here, is that the information sought to be discovered must be "relevant" to the pending action. The test of relevancy under Rule 26 is not the same as the more stringent relevancy requirement of Rule 401 of the North Carolina Rules of Evidence. *See* N.C. R. Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."); *see also Adams v. Lovette*, 105 N.C. App. 23, 29, 411 S.E.2d 620, 624 (1992), *aff'd,* 332 N.C. 659, 422 S.E.2d 575 (1992). Moreover, a determination that information is relevant for discovery purposes does not necessarily mean that the information is admissible at trial. The latter determination is made according to Rule 401 of the Rules of Evidence. *Shellhorn v. Brad Ragan, Inc.*, 38 N.C. App. 310, 314, 248 S.E.2d 103, 106 (1978). To be relevant for discovery purposes, the information sought need only be "reasonably calculated" to lead to the discovery of relevant evidence admissible at trial. *See* N.C. R. Civ. P. 26(b)(1).

D.

ANALYSIS

1.

RELEVANCE

{49} FHP argues it needs the detailed information on Lakeland's EUAs because "[t]he agreements, their legality, and their disclosure are directly relevant to the crucial issue of whether the Plaintiffs' demand that [FHP] warrant that [Lakeland] had not engaged in any illegal conduct, had not made any illegal payment to any supplier or government employee, and had

disclosed all material contracts to the [buyer] was 'reasonable,' as required by the governing LLC Agreement." The EUAs and their legality are relevant to FHP's defense of the breach of contract claims against it. However, the Court finds that the blank forms which Plaintiffs have agreed to produce give FHP adequate information to assess the legality of the EUAs. The blank forms will allow FHP to review and analyze the material terms of the EUAs while protecting Lakeland's confidential business information. The names of the teachers who signed the EUAs, along with their locations and dates of signing are not necessary in order for FHP to meaningfully review the agreements in connection with the defense of this matter.

2.

## CONFIDENTIAL BUSINESS INFORMATION

{50} The Court must take special care to safeguard Lakeland's confidential business information in this case because of a number of connections between FHP and School Tours of America ("STA"), a competitor of Lakeland in the educational tours business. Frank Harvey's son, Lance Harvey, is a partner in FHP and the principal of STA. (Pls.' Mem. Opp'n Def.'s Mot. Compel 1–2.) Lance Harvey also served on Lakeland's Management Committee until November 2000. (*Id.* at 12 n.7.) Plaintiffs note that during their tenure on the Management Committee, Frank and Lance Harvey did not raise concerns about the legality of Lakeland's EUAs. (*Id.* at 12.) Yet even before this litigation began, the Harveys attempted to obtain "[a]ll contracts with school teachers, and all company documents relating to such contracts or the practice of using such contracts" pursuant to section 18-305 of the Delaware LLC Act which entitles members to inspect certain company records. (*Id.* at 13, Ex. D at 2.) Lakeland is concerned that if it is required to turn over all information related to its EUAs, the information will make its way into the hands of STA.

{51} The Court of Appeals has noted that "the courts under our rules should be careful in the interests of justice to prevent disclosure of confidential commercial information to avoid annoyance, embarrassment or oppression, particularly where the action is between competitors." *Harrington Mfg. Co. v. Powell Mfg. Co.*, 26 N.C. App. 414, 417, 216 S.E.2d 379, 381 (1975). This action is not between competitors. However, given the connections between Frank Harvey, Lance Harvey, and STA, the Court must proceed with the same caution the Court of Appeals called for in *Harrington*. This weighs against disclosure of the information FHP seeks in its motion to compel.

3.

## PRIVILEGE CONCERNS

{52}  A number of FHP's discovery requests also seek communications that may very well be protected by the attorney-client and work product privileges.  For example, the request for "documents showing legal communications related to the Exclusive Use Agreements and their legality, disclosure, and the Company's potential liability therefore [sic]."  This request would seemingly include privileged communications as well as the "mental impressions, conclusions, opinions or legal theories of an attorney or other representative of a party" protected by the work product privilege.  *See* N.C. R. Civ. P. 26(b)(3).  Were the Court to allow such a request to stand, both the parties and the Court would spend the foreseeable future mired in discovery motions and reviewing privilege logs.  In light of the tenuous connection between the EUAs and the claims and defenses, this would be a waste of resources for both the parties and the Court.

{53}  For these reasons, Defendant's motion to compel is denied.


## VII.

## DEFENDANT'S SECOND MOTION TO COMPEL PLAINTIFFS TO PRODUCE DOCUMENTS AND ANSWER REQUESTS FOR ADMISSION

{54}  In its second motion to compel, Defendant requests that the Court compel Plaintiffs to answer Request for Admission Numbers 25–31 and to produce documents in response to Request for Production Numbers 31–34 and 40–48.  The first class of requested discovery asks Plaintiffs to provide admissions relating to the blank forms of EUAs that it has employed.  FHP requests that Plaintiffs admit basic terms of the agreements, the consideration given for the agreements, the present existence of such agreements, and nonprivileged conversations that Plaintiffs have had with respect to the legality of contract with the features of the blank form agreements. FHP has also asked Plaintiffs to provide it with documents reflecting notes of conversations with Plaintiffs had with FHP.  The second class of requested discovery involves requests for production of documents relating to the EUAs, including (1) documents reflecting consideration of the EUAs by the board, (2) documents reflecting nonprivileged correspondence with lobbyists hired to solicit governmental opinions regarding the EUAs, and (3) documents reflecting Lakeland's correspondence with various accrediting, regulatory, and industry bodies regarding the EUAs.

{55} As above, the Court denies FHP's second motion to compel based primarily on relevance. The Court has dismissed most of FHP's counterclaims. Discovery requests must therefore be relevant to Plaintiffs' claims for declaratory judgment and breach of contract, or FHP's defenses thereto. The EUAs are relevant to FHP's defense in a limited manner. However, the Court must balance this against Lakeland's valid concerns over the integrity of its confidential business information. This lawsuit concerns FHP's alleged breach of the Lakeland LLC Agreement. It is not an action against Lakeland for use of allegedly illegal agreements with teachers. The Court finds the blank form contracts to be adequate for purposes of FHP's defense. The attendant information sought by FHP in this second motion to compel is not relevant for purposes of FHP's defense, and its production would result in an unnecessary risk of exposure of Lakeland's confidential business information.

{56} For these reasons, Defendant's second motion to compel is denied.


## VIII.

## CONCLUSION

{55} Based on the foregoing, it is hereby ORDERED, ADJUDGED, AND DECREED:

1. Plaintiffs' motion to dismiss Defendant's counterclaims for ultra vires corporate conduct, breach of fiduciary duties, declaratory judgment, breach of duty of good faith, aiding and abetting breach of fiduciary duties, and bad faith—punitive damages is GRANTED. Plaintiffs' motion to dismiss Defendant's counterclaim for conversion is DENIED as to Lakeland but GRANTED as to Shimp.

2. Defendant's motion to add additional counterclaim defendants is DENIED.

3. Plaintiffs' motion for protective order is GRANTED. The protective order is filed contemporaneously with this Order.

4. Defendant's first motion to compel is DENIED.

5. Defendants' second motion to compel is DENIED.


IT IS SO ORDERED, this the 5th day of March, 2007.