# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CANCAN DEVELOPMENT, LLC, ROBERT A. GRANIERI, ROBERT J. GRANIERI and GEORGE TOTH, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 6429-VCL |
| SANDRA MANNO and MANNO ENTERPRISES, LLC, | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: March 30, 2015
Date Decided: May 27, 2015

Stephen E. Jenkins, Catherine A. Gaul, ASHBY & GEDDES, P.A., Wilmington, Delaware, *Counsel for Cancan Development, LLC, Robert A. Granieri, Robert J. Granieri, and George Toth.*

James S. Green, Sr., Jared T. Green, SEITZ, VAN OGTROP & GREEN, P.A., Wilmington, Delaware, *Counsel for Defendants Sandra Manno and Manno Enterprises, LLC.*

**LASTER, Vice Chancellor.**

Sandra Manno has excelled at coming up with concepts for new casinos. She also has a talent for convincing early-stage investors to back her ideas. But she has failed at moving her ventures beyond the concept stage. In addition to lacking the requisite management skills, Manno loves living large. It may be that some degree of flash and pizzazz is necessary to succeed in the casino business, but Manno's ventures have misallocated their seed capital to expensive meals, luxury hotels, first-class travel, and premature marketing activities.

This litigation arises out of Manno's third attempt at a new casino: the French-themed CanCan Casino in D'Iberville, Mississippi. Manno envisioned an adjacent retail complex, also French-themed, called the French Market. This decision refers to them together as the Project.

Robert J. Granieri and his son, Robert A. Granieri, invested in the Project. RG Junior[1] took the lead and supplied the vast majority of the capital. The Granieris initially committed to invest $2,030,000[2] in CanCan Development, LLC, a newly formed entity.[3]

---

[1] The parties have tried shorthand methods of referring to the Granieris, including initials (RJG versus RAG) and nicknames (Bob versus Rob). These forms do little to help a reader not immersed in the case distinguish father from son. This decision uses RG Senior and RG Junior to maintain the distinction. No disrespect is intended.

[2] There was a factual dispute over the amount. This decision resolves the dispute in favor of the Granieris. RG Junior, who testified at trial, was a careful and credible witness. Manno was not.

[3] The original entity was a Mississippi limited liability company. In March 2010, it merged into a Delaware limited liability company with the same name. Manno knew about the merger, did not object, and ratified the change by signing the Delaware entity's

1

The Granieris understood that their investment would fund an option on land and pay for professional services that CanCan needed before seeking third-party financing. They understood that financing was available, largely because CanCan could raise money using Gulf Opportunity Zone bonds ("GO Zone" bonds), a government-subsidized program to encourage redevelopment after Hurricane Katrina.

Instead, Manno and her partner, Joseph Py, repeatedly asked for more capital. At first the amounts were relatively small, at least compared to RG Junior's considerable net worth, so he went along. But eventually RG Junior felt the need to cut his losses or take a more active role. After conducting the due diligence that he admitted he should have conducted initially, RG Junior realized that Manno was bad news.

After first seeking to be bought out, RG Junior asserted control over CanCan, fired Manno, and reached an amicable separation with Py. Manno disputed whether she had been removed as a manager, leading to an initial round of litigation in this court. *See CanCan Dev., LLC v. Manno*, 2011 WL 4379064 (Del. Ch. Sept. 21, 2011).

Through the earlier litigation, RG Junior established his control over CanCan. He and George Toth, who took over managing the Project from Manno, uncovered evidence that Manno had used the Project to enrich herself, her family, and their friends through generous compensation, frequent cash withdrawals, and lavish living, as well as by using CanCan's resources to fund unrelated ventures.

---

operating agreement. Because the distinction between the entities is not material, this decision refers to them jointly as CanCan.

Although Manno no longer had an active role in the Project, she still owned equity in CanCan. She also claimed to own personally the Project's intellectual property and, through a different entity, an option on critical real estate. This decision rejects Manno's ownership claims, but at the time, they caused problems for CanCan.

Toth and RG Junior determined that CanCan needed at least $25 million in additional funding before it could hope to access the capital markets. That estimate proved conservative. RG Junior understandably did not want to invest that kind of money given Manno's claims. To move forward, he mapped out a transaction that would give Manno an opportunity to put up her proportionate share (approximately $1.6 million). If Manno agreed, then RG Junior would invest the balance. If Manno declined, then RG Junior would dissolve CanCan.

Despite having a financial backer who claimed to want a piece of the Project, Manno did not put up her share. RG Junior dissolved CanCan, purchased its assets, and went forward on his own. Manno asserts that by doing so, RG Junior breached his fiduciary duties to CanCan, and that RG Senior and Toth aided and abetted his breaches of duty. She also challenges various transactions preceding the dissolution.

This post-trial decision holds that Manno breached her duty of loyalty by extracting undeserved compensation from CanCan and through other forms of disloyal and wasteful spending. She is personally liable to CanCan for $970,123. This decision finds that RG Junior did not breach his fiduciary duties to CanCan, which moots the claims for aiding and abetting against RG Senior and Toth. But as RG Junior responsibly conceded, he still owes $130,000 to Manno Enterprises, LLC, for a 2.5% member in

3

CanCan that he purchased. For their part, Manno and Manno Enterprises owe CanCan $30,000 under a settlement agreement that Manno breached.

## I.     FACTUAL BACKGROUND

Trial took place on January 12-15, 2015. The following facts were proven by a preponderance of the evidence.

## A.     Manno's Background

Manno has an interesting life story. She grew up in New Jersey and attended Rosemont College, where she received degrees in business and theology. After college, she became a Jesuit nun. When testifying, Manno often mentioned her time in the convent and her devotion to her faith.

After four years as a nun, Manno went into business with her father and her uncle. The details are sketchy, but the business seems to have involved media consulting. Manno's next stop was local government, and in the late 1970s she served as mayor of Marlton, New Jersey. While mayor, she became involved in the successful effort to legalize gambling in Atlantic City. That experience led to her becoming an assistant to James Crosby, the chairman of Resorts International, one of Atlantic City's gaming pioneers. Manno testified about a number of memorable incidents during her ten years at Resorts, including an occasion when she helped Crosby purchase a whale. After leaving Resorts, she held other unidentified positions in the casino industry.

During the 1990s, Manno developed cancer. After successful treatment, she enrolled in law school. While there, she unfortunately developed a second form of cancer,

4

which cut short her legal education. Fortunately, her treatment was again successful. Sadly, during this litigation, Manno had another relapse.

After her second bout with cancer, Manno became a promoter of casino startups and related projects. From 2002 to 2004, she and Py pursued a partnership with the Keetoowah Economic Development Authority to build a casino in Oklahoma (the "Keetoowah Venture"). She generated interest and raised some seed capital, but the project ended badly. David Flaum, one of her business partners, sued Manno for mismanagement, self-dealing, and waste.

In 2004, Manno shifted her efforts to the Gulf Coast. She pursued a plan to build a Cuban-themed casino in Biloxi, Mississippi, but Hurricane Katrina disrupted that effort. Her third venture—the Project—led to this litigation.

## B. Manno's Initial Efforts In D'Iberville

In 2008, Manno conceived of the Project to capitalize on D'Iberville's French heritage. For seed money, she turned to Py. He arranged for David Khawam, an attorney and mutual friend, to fund an initial reconnaissance trip. Khawam formed an entity, DK Suites Development, LLC ("DK Suites"), to undertake the venture. Manno received an interest in DK Suites.

In spring 2009, Manno and Khawam traveled to D'Iberville. They met with the mayor and investigated sites. The trip was successful, resulting in a development agreement between the city and DK Suites dated April 29, 2009.

Manno and Khawam preferred a site centered on a five-acre parcel owned by the Sacred Heart Parish of the Catholic Diocese of Biloxi (the "Church Property"). It was a

prime location for a new casino. As customers traveled on Interstate 10 to the existing casinos in Biloxi, they would encounter CanCan first.

In summer 2009, Manno discussed buying the Church Property with Bishop Roger P. Morin and the Sacred Heart Parish Council. Manno contemporaneously sought investors for the Project, but without success. In August, Py arranged for a friend of his, Margaret McCulley, to loan Manno $25,000, collateralized by her interest in DK Suites.

Over the summer, Manno and Khawam had a falling out. On September 1, 2009, Khawam wrote to the mayor describing various grievances against Manno and stating that he wanted to continue the Project without her. Manno convinced the city officials to cancel the contract with DK Suites and execute a new contract with a new entity, CanCan Casino Resort & Spa, LLC. The new development agreement was backdated to April 29, the date of the original agreement with DK Suites. Because the CanCan Casino entity later became a wholly owned subsidiary of CanCan, this decision calls it Casino Sub.

Manno also reached an agreement in principle with the Sacred Heart Parish. For a payment of $125,000, which would be credited towards the purchase price, Casino Sub would receive an option to acquire the Church Property for $6 million at any point in the next ninety days. Casino Sub could extend the option for an additional sixty days by paying another $125,000, which also would be credited towards the purchase price.

### C. The Granieris' Initial Investment

Manno needed a financial backer to fund the option. Py approached his friends the Granieris. Py knew that RG Senior ran a hospitality company and that RG Junior was a

principal in an London-based financial firm. Py estimated RG Junior's net worth at $400 million.

In June 2009, Py asked the Granieris to provide short-term financing for the option and other near-term expenses. Py told the Granieris that, with the option in-hand, the Project could secure long-term financing that would include GO Zone bonds. Part of the financing would be used to repay the Granieris. After several discussions with Py, the Granieris agreed to invest. They did not conduct due diligence because they trusted Py.

As the vehicle for the Project, the parties formed CanCan. In return for a 42% member interest, the Granieris committed $2,030,000. They allocated their member interest disproportionately, with RG Junior committing $2,000,000 and taking 32%, while RG Senior committed $30,000 and received 10%. In return for the remaining 58% member interest, Manno and Py contributed their ownership interest in the two limited liability companies that comprised the Project: (i) Casino Sub, which was a party to the development agreement and would carry out the casino side of the Project, and (ii) French Market Enterprises, LLC ("Market Sub"), which would acquire the land for the retail portion and carry out that side of the Project. Casino Sub and Market Sub became subsidiaries of CanCan. Py and Manno divided their 58% interest equally, with each owning 29%. Manno held her interest through Manno Enterprises, a pre-existing entity.

Although the evidence at trial established that these were the terms of the deal, the parties did not reduce their agreement to writing. They did not execute an operating agreement for CanCan until December 2010. The lack of formal documentation allowed Manno to claim, falsely, after disputes arose, that she separately owned Casino Sub and

7

the Project's intellectual property. She did not. Manno and Py contributed all of their ownership rights in the Project, including its intellectual property, to CanCan as part of the transaction with the Granieris. Casino Sub became a subsidiary of CanCan.

**D.      CanCan Spends The Granieris' Investment.**

As the Granieris expected, Manno and Py used the funds from the Granieris to pay Sacred Heart Parish for the option. With the balance of the money, Manno secured office space in D'Iberville for $2,000 per month and began building up her team.

Manno brought on her younger brother, Joseph "Joey" Manno, as President of Casino Sub. Joey's job was to manage the casino side of the Project. He had relevant experience, having managed casinos Atlantic City and Las Vegas. The record does not suggest that Joey had experience in casino development or construction management, which were critical skills at the startup stage. Manno paid Joey $30,000 a month starting in November 2009. The evidence suggests that Joey's salary was generous.

Manno also used Joey to avoid regulatory scrutiny. She listed him as the owner of her equity interest in CanCan on filings with the Mississippi Gaming Commission to conceal her involvement in the Project until after she had cleaned up various outstanding judgments and unfiled taxes. Joey was a front. Manno always owned the equity, and her representation to the Mississippi Gaming Commission was false. As an aside, there is no evidence that the Granieris or Toth knew about or were involved in misleading the gaming authorities.

Manno hired Tim Alamsha to as President of Market Sub. His job was to manage the retail side of the Project. Alamsha was a former Disney executive. No one has challenged his qualifications or compensation. He left the Project in fall 2009.

Manno hired Darrel Rholdon as her full-time personal assistant, Ed LePolma as her full-time driver, and Stacey Brunson as her full-time administrative assistant. Rholdon and LePolma were paid $40,000 per year. Brunson was paid $75,000 per year.

In addition to employees, Manno hired consultants. Manno retained two public relations firms. She also contracted with Frank DuMont, an architect friend who was involved with the Keetoowah Venture, to handle all of the architectural work for the Project for $10.5 million. That figure proved excessive. After Manno was fired, Toth secured a comparable contract for $3 million.

Manno also began paying herself. Before the Granieris invested, Manno had not received any compensation. Afterwards, Manno began paying herself $10,000 per month. Py had told RG Junior that this was Manno's compensation, and he did not object to the amount. Manno also billed her living expenses to CanCan. She contended that an apartment and car were part of her compensation package, and she treated all of her meals and entertainment as business expenses. The only expenses she did not charge to CanCan were obvious personal items like hair care products and toothpaste.

Although Manno spent the money, Py signed the checks. Manno did not have check-signing authority, so she sent Py requests for payment. Py wrote whatever checks Manno asked for without any meaningful review or oversight. Complicating matters further, Manno and Py did not distinguish between her consulting fee and the

9

reimbursement of her expenses. When asked during this litigation to review checks from Py, Manno could not explain which payments represented which.

### E. CanCan Needs More Capital.

With Manno spending freely, CanCan soon needed money. The Granieris were the logical source, and in February 2010, Py organized a dinner in New York to pitch them on additional investments. Manno, Joey, and DuMont attended. So did Py and his lawyer. RG Junior spent most of the meeting talking with Joey, and the Granieris came away with a favorable impression of him.

On April 30, 2010, RG Junior traveled to D'Iberville. He visited the Church Property, toured CanCan's office, and met the staff. Manno discussed the Project with him over lunch and introduced him to some city officials.

RG Junior decided to invest more. He still believed it was a short-term investment and that he would be taken out via a refinancing package that included GO Zone bonds.

### F. RG Junior's Additional Investments

In the spring and summer of 2010, RG Junior made three additional investments: $2 million on April 12, $1 million on June 8, and $1.5 million on August 23. Neither side focused on these transactions at trial.

Although no one objected to them, the transactions were odd. Each time, Py transferred a portion of Manno's and his interests in CanCan to RG Junior. For example, in return for the $2 million in April 2010, Py decreased Manno's and his ownership percentages by 4% and increased RG Junior's by 8%. If Py had accounted for the investment properly, he would have determined a price for CanCan's member units and

10

caused CanCan to issue the appropriate number to RG Junior. The other members—Py, Manno, and RG Senior—would have been diluted proportionately. Instead, Py and Manno viewed CanCan as a bilateral relationship between operators (Manno and Py) and financiers (the Granieris). To keep things simple, Py treated the investments as transferring interests from the operator side to the financier side.

In the June 2010 transaction, in return for $1 million, RG Junior's percentage ownership interest increased by 5%. Py decreased his own interest by 1.5%, Manno's interest by 1.5%, and RG Senior's by 2%. The reallocation of interests between the Granieris did not matter to Manno and Py because it happened on the financiers' side of the ledger. Effectively the financiers purchased 3% from the operators.

In the August 2010 transaction, in return for $1.5 million, RG Junior's percentage ownership increased by 5%. Py decreased his own interest by 2%, Manno's interest by 2%, and RG Senior's by 1%. Again, the reallocation between the Granieris was not relevant to Manno and Py. Effectively the financiers purchased 4% from the operators.

During this period, the Granieris still believed that that they would be taken out promptly through a financing that included GO Zone bonds. As late as October 2010, RG Junior thought CanCan could obtain financing and repay two-thirds of his investment.

At trial, Manno denied knowing about the 2010 investments, but that was not true. She attended the February meeting to obtain more money from the Granieris, and she brought RG Junior down to D'Iberville to close the deal. She was running CanCan's day-to-day operations and had spent $6.5 million by August. She could not have believed that CanCan was still operating on the Granieri's initial investment of $2 million.

11

Manno subsequently saw and approved the allocation of percentage interests that resulted from RG Junior's investments. In June 2010, her counsel sent her two emails that listed Manno's ownership interest at 23%, Py's at 24%, RG Junior's at 45%, and RG Senior's at 8%. Her counsel's emails stated that he planned to use the information for government filings and she did not object. At the time, Joey was listed as the owner, but that was to mislead the gaming authorities. Manno actually owned the equity. Once again, there is no evidence that the Granieris or Toth knew about or were involved in misleading the gaming authorities.

## G. RG Junior Purchases 2.5% Each From Py And Manno.

In the summer of 2010, Py and Manno needed money to settle debts unrelated to CanCan. They offered to sell RG Junior some of their interests, and RG Junior agreed to pay each of them $300,000 for a 2.5% interest. Unlike RG Junior's prior investments, these transactions were true member-level transfers.

RG Junior paid Manno $170,000 of the agreed-upon $300,000. At trial, Manno claimed it was a gift. It was not. RG Junior later acknowledged that he still owed Manno $130,000. That amount remains outstanding.

## H. Manno Spends More Money.

After the dinner meeting in February 2010, when it appeared the Granieris would invest, Manno hired her sister, upped her own salary, and hired various friends. She began spending even more freely.

In March 2010, Manno added her sister, Patty Manno, to the payroll at $5,000 per month. Patty did not start work until months later. Like Joey, Patty had managed casinos

and was a licensed casino operator in New Jersey. But Patty did not actually do anything for the Project, likely because it never reached the operating stage. Patty was only in CanCan's office once or twice every six weeks, and she never generated any work product. She spent most of her time writing a children's novel and visiting with her sister.

Manno wrote Patty paychecks totaling $40,000 through November 2010. At that point, CanCan implemented a direct deposit payroll system. Strangely, Manno routed Patty's pay to her own personal bank account. In January 2011, Manno increased Patty's pay to $7,500 per month while continuing to route it to her own account. Shortly after each deposit hit her account, Manno made large cash withdrawals. Manno claimed (not credibly) that she gave the money to Patty.

In April 2010, Manno increased her consulting fee to $15,000 per month. In September, Manno increased her consulting fee to $30,000 per month. With Joey and Patty also on the payroll, CanCan was paying the Manno family $70,000 per month.

Manno also hired her longtime friend Lisa Marie Ponzio, who was working as a part-time hairdresser. Although Manno said Ponzio had "B-B+" writing skills, Manno added her to the payroll in October 2010, ostensibly to draft press releases and prepare sales and marketing kits. CanCan already had two public relations firms working on these and other projects. Other CanCan employees testified that Ponzio did not actually work on press releases or marketing. She spent her time visiting with Manno and working on a screenplay about Manno's life. Ponzio also helped Manno pitch a reality TV show based on her life. Manno fired Ponzio in December 2010 for inappropriate behavior at a holiday

13

party. CanCan paid Ponzio $8,750 in consulting fees, for first-class airfare, and for her transportation and meals while in Mississippi.

Another hire was Rita Sulprizio, an old friend of Patty's. In an email to Manno, Sulprizio proposed to help with the human resources function by reviewing the employee handbook, revising job descriptions, and implementing a reporting system in which each employee would provide a weekly summary of their work. She did some work, but not much. CanCan's human resources function was primarily handled by Stacey Brunson. CanCan paid Sulprizio a total of $13,516.51 in salary and severance.

Manno's most colorful hire was Frank Barbera, aka "Frankie the Fish." He was a convicted felon who pled guilty after being arrested by the FBI in October 2008 for paying cash bribes to the president of the Atlantic City Council. He worked as a real estate broker in Atlantic City, and Manno hired him as a real estate consultant to advise her about the French Market. Manno claimed to have perceived the risk that the Mississippi gaming authorities might react negatively to Barbera's involvement. She said she received advice that it was not an issue. CanCan paid Barbera $6,000 for two months of consulting services.

Manno's personal spending increased as well. She withdrew significant amounts of cash and spent liberally on meals, travel, and entertainment.

### 1. Cash Withdrawals

Between September 2009 and March 2011, Manno used the CanCan debit card to withdraw $97,999.50 from ATMs. She regularly made withdrawals of $500 and $600 and typically withdrew over $1,100 per week. Many withdrawals came from ATMs at the

14

Beau Rivage Resort & Casino and other locations in the Biloxi area; a smaller number came from ATMs in New York, New Jersey, and other areas Manno visited. Manno had the only copy of CanCan's debit card and made most of the withdrawals personally. Sometimes, however, she sent employees to get her cash.

During this same period, Manno made frequent cash withdrawals from her personal accounts. She withdrew over $132,000 from her Manno Enterprises account and $62,000 from her Peoples Bank account.

In total, Manno withdrew over $285,000 in cash while managing the Project. Her attempts to explain how she used the cash only damaged her credibility. She testified that she used cash to pay the office rent, but CanCan always paid by check or wire transfer. She testified that she used the cash for meals, but CanCan's documented expenditures for meals exceeded $142,000 during Manno's tenure, including receipts for meals in excess of $100,000 that lacked a properly documented business purpose. She testified that she used the cash for gifts, but the example she used was inaccurate. She claimed that she spent $300 in cash for a gift for Bishop Morin, but the gift actually cost $99.90, including shipping and handling, and was charged to CanCan's debit card.

Manno also testified that she used cash to pay for gasoline, but she submitted receipts for an impressive number of gasoline purchases. For example, during the eighty-two days between May 10 and July 31, 2010, CanCan paid for sixty-six purchases of gasoline at a total cost of $1,965.86. To put those amounts into perspective, a gallon of regular gas cost roughly $2.50 in Mississippi at that time, so CanCan paid for around 785

15

gallons of gas. Favoring Manno by assuming a rate of 17.2 miles per gallon,[4] that equates to 13,500 miles traveled in those eighty-two days. Manno did make occasional trips to Jackson, Mississippi, and more frequent trips to New Orleans, but when she made those trips, her restaurant charges usually showed where she. During May, June, and July 2010, she spent the vast majority of her time in the Biloxi area. Cancan could not have legitimately incurred this amount of mileage on business trips. And given that CanCan spent so much on gas, Manno could not have been using her cash for that purpose.

Internal emails revealed what most likely happened to the cash. Manno worried about her financial security, and she wrote that she needed "to arrange for some cash . . . [to] put away in a lock box here to feel secure." JX53. She expressed similar sentiments when asked to sign an operating agreement for CanCan, telling Py that "I cannot agree to sign this agreement unless I get a clump of money to hold in reserve and put towards a house at the shore . . . ." JX 137. Manno tried to achieve her goal.

### 2. Meals And Entertainment

Through April 2011, CanCan spent approximately $142,411.69 on meals and entertainment. The spending was poorly documented. Only $7,083.71 was supported with

_____

[4] This figure is the average fuel efficiency reported by the United States Department of Transportation for the existing fleet of U.S. light-duty, long-wheel-base vehicles in 2010, which included vans, pickup trucks, SUVs, and large passenger cars with a wheel-base longer than 121 inches. As a measure of the existing fleet, it included older vehicles. The average for new vehicles sold in 2010 is roughly twice that figure. The lower mileage rate favors Manno by reducing the estimated number of miles. If she drove a newer, smaller, or more fuel-efficient car, then the volume of gas purchased becomes all the more excessive. *See* http://www.rita.dot.gov/bts/sites/rita.dot.gov.bts.

properly documented business purposes. CanCan staff retrospectively identified proper business purposes for another $34,583.65. That left $100,744.33 in meals and entertainment without a proper business purpose.

Some examples illustrate how CanCan incurred expenses of this magnitude. On September 7, 2010, Manno spent $401.85 on brunch with Patty while taking her to the airport. In October, Manno charged CanCan $640 and $320 for two meals at the same restaurant. Other meals charged to CanCan with no documented business purpose included $576.69 at the restaurant Thirty-Two, $1,359.33 at the Beau Rivage, another $1,215.41 at Thirty-Two, and $1,276.96 at the BR Prime Steakhouse.

### 3. Transportation and Hotels

Manno caused CanCan to pay for airline tickets, usually first class, for Patty, Ponzio, Sulprizio, and Barbera whenever they traveled to and from Mississippi. CanCan paid for Ponzio's airfare in May 2010, months before she was hired, and again months after she was fired when she returned to help Manno pack for her move back to New Jersey. Manno also caused CanCan to pay for limousines to transport individuals to and from the airport with an additional $50 tip for the driver each way. While a car service might sometimes be reasonable, CanCan already was paying for a car and full-time driver for Manno. CanCan paid $60,449 for flights with no business purpose and spent $18,180 on limousines.

Manno similarly caused CanCan to pay for hotel rooms for people working on or associated with her personal projects. Manno claimed that many of the rooms at the Beau

Rivage were complimentary, but in reality, CanCan always paid. CanCan incurred $41,448 in hotel charges without any documented business purpose.

### 4. The Super Box

Manno caused CanCan to lease half of a Super Box at the New Orleans Superdome for seven games of the 2010 NFL season at a cost of $41,600. Manno primarily used the Super Box to party with Patty, Ponzio, and Sulprizio. She rarely entertained business guests.

## I. Toth Joins CanCan.

By the end of summer 2010, RG Junior had invested $6.5 million in CanCan, yet he did not seem to have anything to show for it. During the summer, he tried finalize an operating agreement for CanCan, but Py and Manno resisted. Most notably, they wanted any agreement to eliminate all fiduciary duties. RG Junior and his counsel found that unacceptable, and they were bothered that Py and Manno would ask for it.

In July 2010, Manno fired her brother Joey. The Granieris had a favorable impression of Joey, so his departure provided cause for concern. In September 2010, Manno hired Toth to replace Joey.

Toth had worked as President and CEO of the Mount Airy Casino and Resort in Pennsylvania. Before that, he served as President and CEO of the Sands Hotel & Casino in Atlantic City. He appears by all accounts to be a competent operator, and he was a credible witness.

When Toth arrived on the scene, the Project was a mess. It had no financial statements, no budgets, no business plans, and no clear reporting structure. The team did

not meet regularly to coordinate operations or for updates. Toth instituted weekly operational meetings and began preparing a budget. He "had to build the budget from zero, because there were no books which would tell us what was spent prior to that." Tr. 611 (Toth).

At the time, Manno still was pursuing a near-term financing package that incorporated GO Zone bonds. During fall 2010, Toth traveled to New York to meet with potential investors and to speak with investment banks. RG Junior attended these meetings. After speaking to Toth, RG Junior became worried. He had the impression that Toth "was trying to walk a fine line . . . between . . . not saying anything bad about [Manno] but feeling bad for me." Tr. 529-30 (RG Junior).

Matters came to a head when CanCan was unable to obtain financing. RG Junior felt that Manno and Py misrepresented the nature of the GO Zone bonds. His misgivings reached a critical point after a meeting which he thought went very poorly, but

> [Manno] represented it as very positive and sort of misrepresented, I thought, what was very clear. And I couldn't tell if that meant she didn't understand and wasn't confident or was just kind of selling the best possible version that one could take away if they weren't paying attention. I found that very concerning.

Tr. 421 (RG Junior).

RG Junior started asking for more detailed financial information about the Project. He found out that Manno was getting paid twice what he expected and that CanCan's other expenses were much higher than he understood them to be. When RG Junior raised these matters with Manno, she became indignant.

At this point, RG Junior decided to conduct the type of due diligence he should have conducted at the outset. RG Junior commissioned a background check on Manno and hired consultants to evaluate the Project. He considered selling his interest. He decided that if he could not sell, he wanted more control.

In November 2010, to keep the Project operating while he evaluated his options, RG Junior made two additional investments. In early November, he invested $200,000 in exchange for 0.5% each from Py and Manno. In late November he made another $200,000 investment on the same terms.

In December 2010, RG Junior received the preliminary results of the background check on Manno. They were not favorable, and they included references to Manno's previous round of litigation with Flaum, her principal investor in the Keetoowah Venture. The Flaum litigation described a situation similar to what RG Junior was experiencing. At the same time, the consultants were raising red flags. "They found Sandra Manno very difficult to deal with. If they questioned anything, she was very belligerent. There were a number of things they couldn't get. They were pretty worried about it." Tr. 420-21 (RG Junior).

Meanwhile, Manno was pressing for more financing. She claimed it was "absolutely critical that until a satisfactory investor or buyer is found, CanCan MUST be able to continue presenting itself as an attractive and viable project . . . now is absolutely not the time to start restricting or withholding funding." JX 142. She promised that the Project would obtain a new source of funding soon, but contended "[w]e are in a beauty contest with other companies needing funding and must keep our make-up on." *Id.* RG

20

Junior viewed this as "probably the 4th time" that Manno and Py had told him that another million or so was needed before long-term funding could be obtained. *Id*. This time, RG Junior insisted on having an operating agreement before making any more serious investments, although he agreed to make one more $200,000 investment in return for another 1% interest, divided equally between Manno and Py. After sending the money, RG Junior emailed Manno: "Just sent the wire instructions. To avoid confusion, I think this takes me to 58 points. Does that seem right to you?" JX 143. Manno responded, "I BELIEVE SO..BUT WILL CHECK AND LET YOU KNOW TOMORROW...BUT IT DOES SEEM RIGHT." *Id.* She never disagreed with RG Junior's figure.

## J.     The Operating Agreement

On December 20, 2010, the parties signed an operating agreement for CanCan. JX 160 (the "Operating Agreement" or "OA"). Before signing, they exchanged a number of drafts. Manno reviewed the drafts with counsel, and she understood that the draft agreement did not guarantee her any income or returns. Manno's counsel advised her that under the Operating Agreement, "the Granieris recoup 100% of their capital contributions . . . prior to the other members – you and Joe Py – . . . receiving anything." JX 135. Her counsel emphasized that this meant that "unless you have other arrangement in place like a consulting or employment agreement, you may not see any return from your investment with CanCan for some time." *Id.* Manno understood and conveyed the same concerns to Py:

> THE GRANIERIS RECEIVE ALL THEIR MONEY BACK BEFORE
> OTHER MEMBERS . . . UNKLESS [sic] OTHER ARRANGEMENTS
> ARE   IN   PLACE   LIKE   A   CONSULTING   AGREEMENT   OR

21

EMPLOYMENT AGREEMENT OR CORP GIFT OF MONEY…THAT YOU AND I ARE NOT LIKELY TO SEE ANY MONEY FOR A WHILE.

JX 137.

Despite these concerns, Manno chose to proceed. On December 16, 2010, she told her attorney "not [to] do anything else on the operating agreement" and stated, "I full well know I am taking a risk." JX 160. Manno's attorney responded that Manno could at least try to obtain a consulting agreement. When Manno received the final draft, she asked her attorney to verify that no additional changes had been made. Her attorney confirmed that fact and again recommended that Manno insist on a consulting agreement. JX 161. Manno's attorney also warned her that, with RG Junior's latest investments, "the Granieris now make up the Supermajority. This means they control all major decisions for the LLC." *Id.* Manno and Py signed that day.

As shown by Table 1 below, the Granieris actually held a combined 68% interest in CanCan, rather than the full 70% supermajority that they needed under the Operating Agreement to control decisions. Table 1 treats the initial allocation of percentage ownership interests in CanCan as if they represented 100 member units, then calculates the number of member units that CanCan implicitly issued to the Granieris in the pre-Operating Agreement financing transactions. The calculations assume that Py and Manno started out with 58 units divided equally between them, and that RG Junior and RG Senior started out with 42 units, with 32 allocated to RG Junior and 10 to RG Senior.

| TABLE 1 | | | |
|---|---|---|---|
| Transaction Date | Py and Manno's Post-Transaction Ownership | Number of Total Units Implied by Percentage | Number of Units Implicitly Issued To Granieris |
| Initial Deal | 58% | 100.00 | 42.00 |
| 4/2010 | 50% | 116.00 | 16.00 |
| 6/2010 | 44% | 131.82 | 15.82 |
| 8/2010 | 40% | 145.00 | 13.18 |
| Summer 2010 | 35% | 145.00 | N/A |
| 11/2010 | 34% | 149.26 | 4.26 |
| 11/2010 | 33% | 153.79 | 4.53 |
| 12/2010 | 32% | 158.59 | 4.80 |

In the Operating Agreement, the parties agreed to an allocation of ownership interests that included a 5% non-voting interest for McCulley. Nothing in the record explains how McCulley's $25,000 loan to Manno, secured by an interest in DK Suites, became a 5% non-voting interest in CanCan, but no one disputes that it did. Primarily because of the addition of McCulley's interest, the allocation of interests in the Operating Agreement did not match up with what the members otherwise would have had. Drawing on the figures from Table 1, Table 2 shows the number of units held by each member of CanCan after each of the pre-Operating Agreement financing transactions, then calculates the final pre-Operating Agreement percentages and compares them to the Operating Agreement:

| TABLE 2 | | | | | |
|---|---|---|---|---|---|
| Date | Manno | Py | RG Junior | RG Senior | Total Units |
| Initial Deal | 29 | 29 | 32 | 10 | 100 |
| 4/2010 | 29 | 29 | 48 | 10 | 116 |
| 6/2010 | 29 | 29 | 63.27 | 10.55[5] | 131.82 |
| 8/2010 | 29 | 29 | 76.85 | 10.15[6] | 145 |
| Summer 2010[7] | 25.375 | 25.375 | 91.35 | 10.15 | 145 |
| 11/2010 | 25.375 | 25.375 | 95.61 | 10.15 | 149.26 |
| 11/2010 | 25.375 | 25.375 | 100.14 | 10.15 | 153.79 |
| 12/2010 | 25.375 | 25.375 | 104.94 | 10.15 | 158.59 |
| Ending Percentages | 16.00% | 16.00% | 61.60% | 6.40% | 100% |
| Operating Agreement Percentages | 14.50% | 15.50% | 58.00% | 7.00% | 95.00%[8] |

## K. RG Junior Takes Control.

By early 2011, RG Junior decided he needed to exit from CanCan or terminate Manno. He was worried that if they took the latter route, then Manno could use her relationships with Bishop Morin and city officials to sabotage the Project. He wanted an amicable resolution.

RG Junior's preferred outcome was to sell the Granieri's interest in CanCan for $10 million. Under the Operating Agreement, they owned a combined 65% interest, so that price implicitly valued CanCan at $15.3 million. The Granieris had invested $8.1

---

[5] As part of this transaction, Py reallocated a 2% interest from RG Senior to RG Junior. Mathematically, this meant that the number of units implied by RG Senior's post-transaction 8% ownership stake went up from 10 to 10.55 (8% of 131.82).

[6] As part of this transaction, Py reallocated a 1% interest from RG Senior to RG Junior. Mathematically, this meant that the number of units implied by RG Senior's post-transaction 6% ownership stake went down from 10.55 to 10.15 (7% of 145).

[7] This transaction was direct transfer from Py and Manno to RG Junior, leaving Py and Manno with 50.75 units.

[8] The Operating Agreement allocated a 5% non-voting interest to McCulley.

million by that point, and exiting at $10 million would have given them a positive return. RG Junior recognized, however, that finding a buyer was likely impossible.

RG Junior's next-best alternative was for Toth to take over, so he decided to offer Manno a buyout. But before confronting Manno, he decided to secure the 70% supermajority required to remove her as a manager without cause under the Operating Agreement. The Operating Agreement stipulated that the Granieris owned a combined 65% interest. RG Junior knew that if he continued to support CanCan financially, then he and RG Senior would soon clear the 70% threshold.

After executing the Operating Agreement, RG Junior made another investment on the same terms as the December 1, 2010 transaction ($200,000 in exchange for 0.5% each from Py and Manno). Manno agreed to the transaction. He made two more investments on the same terms in February 2011, again with Manno and Py's consent. These investments brought the Granieris' combined total membership interest to 71%, which constituted a supermajority. RG Junior documented his additional investments by obtaining signed acknowledgments from Manno and Py.

With the supermajority in hand, RG Junior convened a meeting of members on February 23, 2011. The minutes reflect that RG Junior asked Manno and Py to resign so that Toth could manage CanCan going forward. As an alternative, RG Junior offered to sell his interest in CanCan for $10 million. Manno and Py said they would only leave if they were fired. Everyone agreed to reconvene in two days time. Manno and Py further agreed that in the meantime, neither of them would cause CanCan to incur any obligations or expenses. Despite her promise, Manno continued using CanCan's debit

card after the meeting, making a total of $6,541.04 in purchases and withdrawing an additional $7,736.75 in cash from ATMs.

On March 3, 2011, RG Junior and Manno met in New York and negotiated what seemed to be a settlement: Manno would give up her interest in CanCan in exchange for an immediate payment of $30,000, she would receive an additional $20,000 upon resigning as a manager, and she would receive another $150,000 upon successful renegotiation of the option on the Church Property. RG Junior paid Manno $30,000 that day. On March 7, RG Junior sent Manno a settlement agreement.

Manno never signed the agreement and never returned the $30,000. On March 8, 2010, RG Junior received a letter from the VMR Law Firm on behalf of Manno. The letter claimed that Manno Enterprises retained ownership of the Project's intellectual property and alleged that RG Junior had breached his fiduciary duties to Manno Enterprises when obtaining a supermajority interest. Later Manno claimed to own Casino Sub personally and through it the option on the Church Property.

On March 10, 2011, the Granieris formally removed Manno and Py as managers. Later that month, Py's attorney called RG Junior and communicated an offer to sell Py's interest for $10 and "be done with the whole thing." Tr. 455 (RG Junior). RG Junior accepted, and the purchase closed on March 21, 2011. RG Junior believed that Py felt guilty about his role in the Project and wanted to avoid litigation.

## L.    The Lawsuits

On March 16, 2011, RG Junior caused CanCan to bring suit in this court seeking a declaration that Manno had been validly removed as a manager of CanCan. As described

in a separate decision of this court, the action resulted in judgment being entered against Manno with her consent. *See CanCan*, 2011 WL 4379064, at \*2.

On April 27, 2011, CanCan brought this lawsuit alleging claims for breach of contract and breach of fiduciary duty against Manno. Manno filed counterclaims in which she asserted that she retained ownership of the Project's intellectual property and owned both Casino Sub and Market Sub. The case evolved into the claims that were tried.

## M.    The Capital Calls

Manno's allegations put RG Junior in a difficult position. CanCan needed millions of dollars in additional funding, but obtaining external financing was not viable option. Indeed, it was a non-starter given Manno's claims. RG Junior could finance the Project himself, but only at the risk of further accusations. RG Junior had no obligation to provide more funding, but if he stopped, the Project would fail and he would lose his entire investment. Despite the risk of throwing good money after bad, putting in more money to keep the Project going at least bought him time to find a solution, whether through litigation or otherwise.

RG Junior retained counsel and considered how to proceed. CanCan did not have any disinterested managers or members who could be empowered to make a decision. He considered continuing the established pattern of investing $200,000 in return for 1% from Manno and Py, but he rejected that alternative because, unless the affected members consented, Py's simplistic method did not work. It also did not make sense. RG Junior understood that if he received additional interests in CanCan, the issuance should dilute all other members, including RG Senior. He also understood that the dilution would not

27

be linear, as Py had treated it. He further recognized that the dilution would never reduce Manno's interest to zero, whereas under Py's method it would.

Without any good options, RG Junior decided to structure his additional investments as capital calls. One benefit of that method was that the members could protect their proportionate shares by participating. To determine a price for the number of units, RG Junior used a price per percentage point slightly more favorable to CanCan and less favorable to himself (and any other participating investors) than the most recent transaction that Manno and Py had approved, in which RG Junior had paid $200,000 for a 1% interest. RG Junior selected the size of each capital call based on estimates of CanCan's short-term funding needs prepared under Toth's direction.

On March 16, 2011, RG Junior caused CanCan to make a capital call on its members for $500,000. RG Senior supplied $50,000. Manno and Py did not supply any capital. RG Junior funded the balance. RG Junior followed the same procedure for capital calls of $500,000 on April 28, $1,000,000 on May 26, and $1,000,000 on June 30, 2011. Each time, RG Junior contributed the entire amount.

## N. RG Junior Buys The Church Property Through A Separate Entity.

RG Junior and CanCan soon faced another problem: the option to acquire the Church Property would expire on July 31, 2011. To exercise the option and purchase the Church Property on the terms Manno had negotiated would require an additional $6 million. RG Junior did not want to invest that much money in CanCan. He also knew that if he purchased the Church Property outside of CanCan, then Manno would accuse him

28

of usurping an opportunity belonging to CanCan. RG Junior seriously considered walking away from the Project.

With the assistance of counsel, RG Junior structured a transaction that would secure the Church Property, permit him to fund the purchase through a separate entity, and preserve CanCan's opportunity to purchase the Church Property if it could obtain the necessary funding. Because RG Junior was not willing to fund the purchase through CanCan, the funding would have to come from another source.

To implement the transaction, RG Junior formed a new entity, Land Holdings I LLC ("Land Holdings"). Land Holdings reached agreement with the Sacred Heart Parish to buy the Church Property for $5 million, which was $1 million less than the price Manno negotiated. The Land Holdings option only could be exercised after Casino Sub's option expired. After it did, Land Holdings exercised its option, and the purchase closed on August 2, 2011. Immediately after closing, Land Holdings granted CanCan an option to purchase the Church Property at the same $5 million price, exercisable at any time before December 31, 2011. CanCan paid Land Holdings $50,000 for the five-month option, less than half the $125,000 that Manno agreed to pay the Sacred Heart Parish for the original 90-day option on the Church Property.

Land Holdings also purchased the other properties surrounding the Church Property for an additional $9.4 million. Land Holdings paid $3 million for new architectural work, which was $7.5 million less than what Manno had agreed to pay her architect-friend DuMont. Land Holdings' total investment was $17.4 million, funded entirely by RG Junior.

29

## O. The Continuing Search For Third-Party Financing

Toth had learned from his earlier meetings with investment banks and potential investors in September 2010 that the Project would not be able to obtain third-party financing without audited historical financial statements, forward-looking budgets, a business plan, a marketing plan, construction drawings, a guaranteed-maximum price for construction from a reputable contractor, and a full management team that included a CFO and an experienced owner's representative to oversee the construction project. Toth worked to check off these items.

By summer 2011, Toth thought CanCan was ready to seek financing. CanCan retained Cantor Fitzgerald & Co. ("Cantor") to raise $400-450 million through a combination of debt and equity. The plan was to finance the Project on the scale Manno originally envisioned, namely a casino resort hotel with 550 rooms and an associated retail shopping center. Cantor could not raise the money. After going to market, Cantor thought they could raise the debt portion but believed there was no appetite for the equity tranche. Even with RG Junior's additional investment, a new and highly qualified management team, and the assistance of an investment bank, a project resembling Manno's original plan could not be financed.

## P. Flaum Contacts RG Junior.

On September 6, 2011, RG Junior received an email from Flaum. RG Junior knew about Flaum from his belated background check on Manno.

Flaum did not identify himself as Manno's former partner. He rather identified himself (accurately) as a successful real estate developer, and he offered to "assist in

30

building the Can-Can project for no compensation" except for "retain[ing] 11-1/2% of the CanCan project with no right of dilution or cash call." JX 285. He claimed that he could save the Project "One Hundred Million Dollars" with his services. *Id.*

From RG Junior's perspective, the email was totally "out of the blue." Tr. 592. But Flaum had not appeared out of the blue. His email was prompted by Manno's behind-the-scenes maneuverings. As noted, Flaum had sued Manno over the Keetoowah Venture. They reached a settlement in March 2007 pursuant to which Manno granted Flaum a 50% interest in the proceeds of all of Manno's future gaming activities. Manno contacted Flaum after she was fired from CanCan. She told Flaum about the Project, which she previously had hidden from him. On July 15, 2011, Flaum and Manno reached a new agreement under which Flaum became a 50% owner of Manno Enterprises through Andrews Biloxi, LLC, an entity he owned. He also paid $40,500 for an option to purchase the other 50% of Manno Enterprises for $1 at any time in the next twenty years. The agreement implied a value of $81,000 for Manno's interest and a value of $1.2 million for all of CanCan's equity.[9]

RG Junior's counsel responded to Flaum's email, but RG Junior did not respond personally. RG Junior did not bring Flaum into the Project.

### Q.    The Put-Up-Or-Shut-Up Transaction

---

[9] Although Manno and Flaum signed their agreement before the second $1,000,000 capital call, the deadline to respond had already passed, so this calculation uses the post-capital call value of 6.6001% as Manno Enterprises' interest in CanCan.

RG Junior and Toth estimated that CanCan required a total of $25 million to get to the point where it could obtain third-party financing. This figure included the $17.4 million needed to buy the assets of Land Holdings. In hindsight, the projection proved to be "very optimistic." Tr. 644 (Toth).

With Flaum on the scene, RG Junior and Toth decided that it was time for Manno to put up or shut up. They concluded that if Manno and Flaum were serious about the Project, then they should invest their proportionate share of the necessary capital. They believed that if Flaum put his own money into CanCan, then they could go forward with a degree of confidence. Once Flaum had skin in the game that aligned his interests with the success of the Project, he could be expected to control Manno and prevent her from sabotaging the effort. If Manno and Flaum did not put up their share of the capital, then it would show that even the Project's most voluble supporters did not regard the entity as viable. At that point, RG Junior could dissolve CanCan and proceed on his own.

On October 18, 2011, RG Junior caused CanCan to issue a capital call in the amount of $25 million. Manno Enterprises had a 6.6001% interest, so its share was $1,650,015. RG Junior committed to contribute his share if Manno Enterprises invested, and he planned to cover the unsubscribed interest of other members other than Manno Enterprises. In other words, "all that was required to finish the capital call would be Mr. Flaum putting up his piece." Tr. 485 (RG Junior). The capital call notice made clear that if the members did not provide the funds, then CanCan could not continue operating. It would "dissolve and the Managers of [CanCan] will proceed to wind up its business and affairs." JX 288.

32

Manno Enterprises did not meet the capital call. Flaum claimed that he believed the transaction was a "sham." Tr. 195 (Flaum). Flaum never called RG Junior or his counsel to discuss it.

## R.    CanCan Dissolves, And Land Holdings Buys Its Assets.

After the unsuccessful capital call, RG Junior caused CanCan and its subsidiaries to dissolve and to wind up their affairs by selling their assets to Land Holdings at book value, plus sufficient funds to pay liabilities due to third party service providers. Land Holdings paid a total of $1,919,722.81. The price was generous. The assets included office furniture, market research, and engineering studies. Except for the office furniture, Land Holdings did not benefit from any of the assets. After the creditors were paid, the remaining amounts went to the Granieris, because the Operating Agreement provided that capital contributions were to be repaid before any other distributions to members. OA § 8(i). The Granieris had contributed a total of $11,430,000 in capital, five times the consideration paid by Land Holdings.

After CanCan and its subsidiaries dissolved, Land Holdings hired many of CanCan's former employees on similar terms.

## S.    Land Holdings Plans To Build The Scarlet Pearl.

After purchasing CanCan's assets, Land Holdings embarked on a scaled-down project called the Scarlet Pearl. Land Holdings abandoned any retail concept and focused solely on the casino hotel. Land Holdings used a new theme and commissioned a new design that reduced its size from 500-to-550 rooms to 300 rooms. Land Holdings

obtained an entirely new set of government approvals because RG Junior was concerned about potential risks associated with Manno's interactions with government officials.

In January 2012, Land Holdings began seeking financing. Land Holdings engaged Cantor and Jefferies & Company, Inc. to raise a combination of debt and equity. The bankers failed.

Land Holdings next entered into discussions with Carl Icahn. Toth had worked for Icahn, and he showed interest, but RG Junior viewed his terms as too onerous.

By this point, RG Junior had invested about $30 million. In 2014, a banker from UBS AG contacted Toth and suggested that if RG Junior wrote the equity check, UBS could place the debt. RG Junior eventually agreed, bringing his total investment to approximately $120 million. RG Junior also provided a personal construction guarantee in the amount of $15 million. UBS raised $140 million in debt, but it paid 12% interest and was sold with a 2% original issue discount. RG Junior also paid a 2.5% fee to UBS.

The Scarlet Pearl is currently under construction. It is scheduled to open in December 2015.

## II.     LEGAL ANALYSIS

At trial, CanCan, the Granieris, and Toth sought to prove that Manno breached her fiduciary duties to CanCan. Because these claims belonged to CanCan, this decision speaks of CanCan as the plaintiff. This decision holds that Manno breached her duties.

For her part, Manno sought to prove that RG Junior breached his fiduciary duties and the Operating Agreement by unfairly diluting Manno Enterprises, usurping a business opportunity by buying the Church Property, and then dissolving CanCan.

Although the proper party to assert these claims is Manno Enterprises, for convenience this decision refers to Manno. This decision rejects her claims. Because the underlying claims against RG Junior fail, this decision does not discuss the claims for secondary liability against RG Senior and Toth.

Finally there are breach of contract claims. CanCan has a breach of contract claim against Manno and Manno Enterprises for failing to comply with a settlement agreement, and Manno Enterprises has a breach of contract claim against RG Junior for failing to pay the balance due for a 2.5% member interest in CanCan. Both succeed.

## A.    The Breach Of Fiduciary Duty Claims Against Manno

Manno owed fiduciary duties as a manager of CanCan. *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 660-63 (Del. Ch. 2012). Manno breached her duty of loyalty.

"The essence of a duty of loyalty claim is the assertion that a corporate officer or director has misused power over corporate property or processes in order to benefit himself rather than advance corporate purposes." *Steiner v. Meyerson*, 1995 WL 441999, at *2 (Del. Ch. July 19, 1995) (Allen, C.). "At the core of the fiduciary duty is the notion of loyalty—the equitable requirement that, with respect to the property subject to the duty, a fiduciary always must act in a good faith effort to advance the interests of his beneficiary." *U.S. W., Inc. v. Time Warner Inc.*, 1996 WL 307445, at *21 (Del. Ch. June 6, 1996) (Allen, C.). "Most basically, the duty of loyalty proscribes a fiduciary from any means of misappropriation of assets entrusted to his management and supervision." *Id.*

"Self-interested compensation decisions made without independent protections are subject to the same entire fairness review as any other interested transaction." *Valeant*

*Pharm. Int'l v. Jerney*, 921 A.2d 732, 745 (Del. Ch. 2007). Decisions by interested fiduciaries to reimburse their own expenses or provide themselves with other corporate benefits are similarly subject to entire fairness review. *Sutherland v. Sutherland*, 2009 WL 857468, at *4 n.16 (Del. Ch. Mar. 23, 2009).

> The burden of accounting for compensation and expenses rests with the fiduciary.

> [F]iduciaries have a duty to account to their beneficiaries for their disposition of all assets that they manage in a fiduciary capacity. That duty carries with it the burden of proving that the disposition was proper . . . . [I]ncluded within the duty to account is a duty to maintain records that will discharge the fiduciaries' burden, and . . . if that duty is not observed, every presumption will be made against the fiduciaries.

*Technicorp Int'l II, Inc. v. Johnston*, 26 Del. J. Corp. L. 689, at *2 (Del. Ch. May 31, 2000). "If corporate fiduciaries divert corporate assets to themselves for non-corporate purposes, they are liable for the amounts wrongfully diverted." *Id.* at *45.

### 1. Manno's Compensation

Manno received $721,000 in total compensation. CanCan concedes that she was entitled to a consulting fee of $10,000 per month fee plus reimbursement of half her $3,000 monthly rent. These were generous concessions, because Manno could not say whether she was supposed to receive $10,000 or $5,000 per month, and only her testimony supported her rent claim. Given CanCan's concessions, Manno was entitled to $207,000 in compensation.

In April 2010, Manno increased her consulting fee to $15,000 per month. In September, she increased her consulting fee to $30,000 per month. Manno claimed at trial that because Py approved the increases, they were protected by the business judgment

rule. Py did not make a business judgment; he simply rubber stamped the larger checks. Plus Py and Manno's relationship was sufficiently close that Py cannot be regarded as independent. Py's involvement did not insulate Manno's unilateral decision from entire fairness review. *See Valeant*, 921 A.2d at 745.

Manno separately attempted to justify her increased compensation as entirely fair. It is possible that a fiduciary might unilaterally assign herself a fair rate of compensation, but without "reference to reliable markets or by comparison to substantial and dependable precedent transactions, the burden of persuading the court of the fairness of the terms will be exceptionally difficult." *Id.* at 748. To justify her increased pay, Manno compared it to Toth's $35,000 per month, Joey's $30,000 per month, and the construction manager's $25,000 per month.

These comparisons were inapt. First, Manno set Toth's and Joey's compensation, and she consistently overpaid. Toth candidly acknowledged that he thought Manno paid him too much, but he was not about to negotiate against his own interests when taking the job. Second, Manno lacked the experience and expertise that these individuals possessed. Third, Manno owned equity in CanCan, so it did not make sense to compensate her in the same way as executives without equity upside. Finally, Manno offered a counter-intuitive justification for increasing her compensation. She contended that her compensation was set to increase *after* she hired a President for Casino Sub. Logically, it should have worked the other way. Filling that position relieved Manno of day-to-day responsibility for the casino side of the Project, so her compensation should have stayed the same or decreased.

As noted, CanCan agreed that Manno was entitled to total compensation of $207,000. Manno actually received $623,000 in consulting fees plus reimbursed expenses that lacked a documented proper business. She also withdrew over $98,000 in cash from ATMs that she could not justify. Her total compensation from these sources was $721,000. She is liable to CanCan for $514,000 in unjustified compensation.

## 2. Joey And Patty's Compensation

The amounts Manno paid Joey and Patty are subject to entire fairness review. Family ties raise doubts about a fiduciary's independence. *See, e.g., In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 823 (Del. Ch. 2005), *aff'd*, 906 A.2d 766 (Del. 2006). Manno's contemporaneous statements confirm her conflict of interest. She told one of her friends, "I would like to keep the money circulating in the family if possible." JX 165. Manno had the burden of proving that the amounts she paid Joey and Patty were fair to CanCan.

CanCan has not challenged Manno's decision to hire Joey or the amount of his monthly compensation. The Granieris met Joey at the New York dinner meeting in February 2010, had a favorable impression of him, and believed his compensation was fair. By April, however, Manno had a different view of Joey. She wrote that hiring him was "the biggest mistake of my life" because "he has no focus, drinks heavily . . . [I] give him only baby stuff to do so he doesnt [sic] [explicative] up and I assign his duties to others and he isnt [sic] even aware of it." JX 46. She stood by this assessment in her deposition. Manno did not terminate Joey until July 2010. Joey's last check was issued on June 30, 2010.

CanCan challenges Joey's compensation after April 1, 2010, contending that given Manno's personal beliefs about Joey's competence, she should have fired him. Manno did not respond to that argument or show that continuing to employ Joey was entirely fair. Manno is liable to CanCan for the balance of Joey's compensation, or $92,778.

Manno failed to prove that paying Patty was entirely fair. In addition to the familial conflict of interest, Manno was self-interested because she diverted Patty's salary to herself. Patty did not recognize the signature on the direct deposit form authorizing deposits into Manno's personal accounts and claimed a distinctive feature of the signature on the form looked "exaggerated." Patty Dep. at 96-97. Patty did not start work until months after Manno added her to the payroll. She was rarely in the CanCan office and did not generate any work product. Manno is liable to CanCan for Patty's compensation, which totaled $66,392.

### 3. Manno's Personal Projects

Manno caused CanCan to expend resources on her personal projects. Manno pursued several of the ventures through Caprara Management LLC and Caprara Enterprises LLC (jointly, "Caprara"), her single-member entities. Manno claimed CanCan owned the projects or benefitted from them. That was not so.

### a. The Online Gaming Project

In December 2010, Manno decided to pursue an online gaming business through Caprara. In contemporaneous documents, Manno described the venture as something that she would work on "personally (with nothing to do with CanCan)." JX 36. In January 2011, Manno hired Catania Gaming Consultants to provide Caprara with "assistance in

obtaining various online gaming and/or cell phone software." JX 19. So that Py would sign the check, Manno replaced the references to Caprara with CanCan, but it was Caprara's contract. The project did not belong to or benefit CanCan. Manno is liable to CanCan for $5,000 for the project.

### b.   The Gulf Coast Food & Wine Festival

Manno sought to establish a food and wine festival in Biloxi. In contemporaneous documents, she identified the festival as something separate from CanCan that she would pursue through Caprara. In September 2010, Manno flew Paula Deen to D'Iberville on a private jet. Manno tried recruit Deen for the food and wine festival. CanCan paid $23,424 for the jet. Manno is liable to CanCan for the $23,424.

### c.   Other Casino Ventures

Once CanCan got underway, Manno pursued other casino ventures. She claimed that she was identifying potential investors for CanCan and that her efforts benefitted CanCan. That was not true. CanCan did not own any interest in the projects and did not benefit from them.

Before starting CanCan, Manno and Py pursued the Keetoowah Venture. They used Rockledge Holding Company and Rockledge Development, LLC (collectively "Rockledge") as their vehicles. With CanCan moving forward, Manno and Py returned to Keetoowah. In December, 2010, Manno signed a development agreement for Rockledge to provide technical assistance and raise capital. Manno contemporaneously described her "contracts in Indian country" as one of her "other-than-CanCan projects." JX 153.

Manno spent considerable time on the Keetoowah Venture, writing at one point that she was "swamped with Keetoowah Indians visiting me for three days" and that "I speak with the tribe every day . . . ." JX 184; JX 187. Manno staffed CanCan employees on the venture. She assigned her personal assistant, Rholdon, to support it, and she identified the "management team" as including Manno, Rholdon, and Sulprizio. JX 178. Manno caused CanCan to fund expenses for the project, including professional fees and a $795 fee for a Native Nations conference.

Manno enlisted the help of Gwen and Cris Klinger for the Keetoowah Venture. The Klingers managed a casino and truck stop in Oklahoma, and Manno frequently sought their advice. In December 2010, Manno flew the Klingers to D'Iberville, where she treated them to expensive meals and luxury accommodations.

In December, 2010, Manno pursued the purchase of a small casino and hotel in Pahrump, Nevada. She caused CanCan to fund professional fees for the project.

Manno also tried to resurrect her plan for a Cuban-themed casino that had been shelved after Hurricane Katrina. She caused CanCan to fund professional fees for the project.

Manno is liable for the resources that she caused CanCan to expend on the Keetoowah Venture, the Pahrump project, and Cuban-themed casino. These amounts include professional fees and the costs of the travel, meals, and lodging, which are addressed in other sections of the opinion. Manno is liable for the value of the time that she and her team spent on the Keetoowah Venture, and she bore the burden of proving how much time she and her team spent on it. To simplify matters, CanCan has requested

41

damages only for Rholdon and stipulated that half of Rholdon's time benefitted CanCan. Manno did not prove that any more of Rholdon's time was devoted to CanCan. Although there is a dispute about the amount Rholdon received, this decision finds that Manno is liable for $10,339 for Rholdon's time. She is also liable for the $795 conference fee.

### d. The Screenplay About Manno's Life

Manno thought there should be a movie about her life, and she hired Ponzio to write it. While employed by CanCan, Ponzio spent her time working on the screenplay. Manno is liable for $8,750 in payments to Ponzio.

### e. Professional Fees

Manno used the law firm of Lewis & Roca to form Caprara and for virtually all of her personal projects. She also sought Lewis & Roca's advice when negotiating over the Operating Agreement. Although some of Lewis & Roca's fees may have related to CanCan, Manno concedes that there is no way to determine the amount. Manno had the burden of proof on this issue. Consequently, she is liable to CanCan for the payments to Lewis & Roca, which totaled $20,855.

Manno also used Allan Pepper, an attorney at Kaye Scholer, to assist Lewis & Roca in litigation with Joey. Pepper worked for Manno personally, but CanCan paid his fees. Manno is liable for the payments to Pepper, which totaled $10,000.

### 4. The Move To New Jersey

Manno caused CanCan to pay for her expenses when she moved back to New Jersey. In October 2010, Manno started setting up an office in New Jersey for her non-CanCan ventures. She wrote, "Rita and Patty left this Sunday afternoon for NJ [with

42

CanCan paying for their travel] and they will go out tomorrow (mon) to visit my new office space . . . . I want to house my four companies there for the Tour de Biloxi[,] the wine and food festival, the reality show, and my two books on the nuns and fixed wing aircraft[.]" JX 118. For her move, Manno hired another old friend, Chuck Matthews and his son Charles, to rent a Winnebago in New Jersey and drive down to get Manno, her husband, and her cats. She also shipped boxes of possessions back to New Jersey. From February 14-21, 2011, Manno shipped fifty boxes weighing a combined 670 pounds at a cost of $1,216.87 to CanCan.

Manno claimed that the boxes were not personal materials, but rather CanCan files. Manno admitted, however, that she never produced in this litigation any of the documents she supposedly shipped to New Jersey, even though they would have been responsive if they were actually CanCan documents.

CanCan proved that Manno was planning to pursue personal projects in New Jersey and that there was no credible CanCan-related purpose for her relocation. CanCan stipulated that the cost of plane ticket from Mississippi to New Jersey would have been fair. After excluding that amount, Manno is liable to CanCan for damages of $10,161.

### 5. Other Expenses

CanCan challenges Manno's excessive spending on limousines, hotels, meals, and flights. Ordinarily, these expenses would be subject to the business judgment rule. Here, many of the expenses related to the interested transactions described above. Manno frequently caused CanCan to pay for limousines, hotels, meals, and flights for Patty and

Ponzio. She also caused CanCan to pay for hotels, meals, and flights for the Klingers and others who were working on the Keetoowah Venture.

More generally, Manno used CanCan to fund her own luxurious lifestyle. Among other things, she charged breakfast, lunch, and dinner to CanCan's debit card nearly daily, and she instructed her staff that all of her meals were office expenses. Even after Manno went back to New Jersey in March 2011, she continued to use the debit card for expensive meals, racking up over $2,000 in less than a week (with almost half of that occurring after she was fired on March 10).

Manno bore the burden at trial "to establish the purpose, amount, and propriety of the disbursements." *Technicorp*, 2000 WL 713750, at *16. She never made that effort. To CanCan's credit, its expert reviewed all of the expenses, identified those with a documented business purpose, and excluded them from CanCan's damages claim. CanCan's expert testified as follows:

- Out of the $121,787.02 that CanCan spent on airfare, $60,449 did not have a documented business purpose.

- Out of $114,696.06 that CanCan spent on hotels, $41,448 did not have a documented proper business purpose.

- Out of $142,411.69 that CanCan spent on meals, $100,744.33 lacked a documented business purpose.

- All of the $18,180 in limousine charges lacked a documented business purpose.

Except for the limousine charges, CanCan generously stipulated that 30% of the undocumented amounts could be viewed as proper. CanCan did not concede that any

44

portion of the undocumented limousine charges were proper. This was understandable, because CanCan paid separately for Manno's car and full-time driver.

Manno did not carry her burden of justifying a greater percentage of the undocumented expenses. Manno is liable to CanCan for $160,029.

### 6. Waste

The plaintiffs challenged four additional expenditures as waste. They identified many other expenses that were imprudent, but conceded that Manno's decisions regarding those expenses were protected by the presumptions of the business judgment rule. The four allegedly wasteful expenditures were (i) the Super Box, (ii) Barbera's compensation, (iii) Sulprizio's compensation, and (iv) expenditures for liquor and cigars.

Although traditionally viewed as a separate cause of action, a waste claim is best understood as one means of establishing a breach of the duty of loyalty's subsidiary element of good faith. *See Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006). Delaware's default standard of review is the business judgment rule, which presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[10] When the rule applies, "the court merely looks to see whether the business

---

[10] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). In *Brehm v. Eisner*, 746 A.2d 244, 253–54 (Del. 2000), the Delaware Supreme Court overruled seven of its precedents, including Aronson, to the extent they reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested deferential appellate review. *Id.* at 253 n.13. *Aronson* and the partially overruled precedents otherwise remain good law.

decision made was rational in the sense of being one logical approach to advancing the corporation's objectives." *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010) (Strine, V.C.). "A court may, however, review the substance of a business decision made by an *apparently* well motivated board for the limited purpose of assessing whether that decision is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." *In re J.P. Stevens & Co., Inc. S'holders Litig.*, 542 A.2d 770, 780–81 (Del. Ch. 1988) (Allen, C.) (emphasis in original). When the business judgment rule applies, a court only will infer bad faith and a breach of duty when the decision lacks any rationally conceivable basis. "Irrationality is the outer limit of the business judgment rule" *Brehm*, 746 A.2d at 264.

The waste test is one way of establishing irrational, bad faith conduct. An irrational decision is "one that is so blatantly imprudent that it is inexplicable, in the sense that no well-motivated and minimally informed person could have made it." William T. Allen, Jack B. Jacobs, & Leo E. Strine, Jr., *Realigning the Standard of Review of Director Due Care with Delaware Public Policy: A Critique of* Van Gorkom *and its Progeny as a Standard of Review Problem*, 96 Nw. U. L. Rev. 449, 452 (2002). To establish waste, a plaintiff must prove that a decision was so out of whack that "no business person of ordinary, sound judgment" would have made it. *Brehm*, 746 A.2d at 263. Or as Chief Justice Strine explained while serving as a Vice Chancellor, a plaintiff must show a decision "so one-sided as to create an inference that no person *acting in a good faith pursuit of the corporation's interests* could have approved the terms." *Sample v. Morgan*, 914 A.2d 647, 670 (Del. Ch. 2007) (emphasis added).

46

Renting the Super Box constituted waste because Manno's explanation was clearly false, and she failed to offer a rational alternative. Manno testified that the Super Box was justified because she reached a deal with Sean Payton, the coach of the New Orleans Saints, under which the Saints provided promotional services for CanCan. The NFL had a league policy at the time that prohibited promotional deals with casinos. To be clear, Manno did not claim that she rented the Super Box in the mistaken hope that she could reach a deal. She testified that she actually "talked with Sean Payton, the coach," "made arrangements, when the kiss cam would go in the stadium so that couples could kiss, the logo of CanCan was the lips," and "had an arrangement with [the New Orleans Saints] that they would send out information about what's coming at CanCan." Tr. 81-82. Under the lenient waste standard, Manno could have justified renting the Super Box to use it occasionally to entertain business guests. The Super Box would have been a rash expenditure, but it would not have constituted waste. Instead, Manno lied about an arrangement that NFL policies prohibited. Lacking any truthful, rational explanation for the Super Box, Manno is liable to CanCan for $41,600.

Hiring Barbera was also waste. The dangers posed by hiring Barbera were readily apparent to any person of ordinary, sound judgment. No rational person would hire a convicted felon from New Jersey, who needed permission from his parole officer to travel out of state, to work in Mississippi in the highly regulated casino industry. Merely associating with a convicted felon put the gaming licenses of key CanCan employees at risk. Supposedly Manno took this risk to take advantage of Barbera's real estate expertise, but Barbara knew about real estate in Atlantic City, not Mississippi. CanCan

easily could have obtained informed advice from local real estate consultants who did not carry Barbera's baggage. Manno is liable for causing CanCan to pay Barbera $6,000 in consulting fees.

By contrast, it was not waste for Manno to hire Sulprizio to assist with the human resource function. Sulprizio was Patty's friend, but she was not a family member. Sulprizio had a background in human resources, and she prepared a list of human resources issues that needed attention. Witnesses observed her engaging in at least some human resources work. Hiring Sulprizio may have been unwise, but it was a protected business judgment.

It also was not waste for Manno to spend $6,446 on cigars and liquor and similar items, which she categorized as expenses for "Advertising/Promotion." Perhaps it is true that Manno purchased these items for herself and her relatives or used them for non-CanCan businesses, but CanCan did not prove that. Manno stated that she gave these items as gifts to potential investors, customers, and suppliers. It was not irrational to spend CanCan's money that way, so the business judgment rule protects these expenditures.

### 7.    Manno Enterprises Is Not Secondarily Liable.

CanCan sought to hold Manno Enterprises secondarily liable for Manno's breaches of fiduciary duty under theories of aiding and abetting and piercing the corporate veil. The aiding and abetting claim was not introduced until the post-trial brief. That was too late to argue a new claim.

48

The veil-piercing claim is actually a reverse veil-piercing claim. Despite seeking to hold Manno Enterprises liable for Manno's conduct, CanCan's arguments rely entirely on instances when courts have done the opposite and held an individual liable for the debts of an entity. "Reverse pierce claims implicate different policies and require a different analytical framework from the more routine corporate creditor veil-piercing attempts." Gregory S. Crespi, *The Reverse Pierce Doctrine: Applying Appropriate Standards*, 16 J. Corp. L. 33, 37 (1990). No one grappled with the different implications. Had the claim been properly presented and supported, it might have prevailed. Under the circumstances, it fails for lack of support.

## B.    Manno's Counterclaims Against RG Junior

Manno pursued counterclaims against RG Junior. She contended that she was promised a consulting agreement that she never received. She argued that RG Junior unfairly diluted her interest in CanCan before she signed the Operating Agreement, unfairly diluted her interest after she signed the Operating Agreement, usurped a company opportunity by acquiring the Church Property, and breached his duties when dissolving CanCan and purchasing its assets. As noted, she asserted that RG Senior and Toth aided and abetted these breaches, but this decision does not reach the aiding and abetting claim.

### 1.    The Consulting Agreement

Manno claims that she was promised a lucrative consulting agreement. Factually, she testified that Py, not RG Junior, supposedly made the promise. There is no

documentary support for her claim, and her testimony was not credible. Regardless, her claim fails as a matter of law.

"[E]vidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing." *James River-Pennington Inc. v. CRSS Capital, Inc.*, 1995 WL 106554, at *5 (Del. Ch. Mar. 6, 1995) (internal quotation omitted). The Operating Agreement is a fully integrated agreement. The Operating Agreement plainly states that any consulting agreement would have to be in writing and approved by a supermajority of members. Manno signed the Operating Agreement. She cannot rely on Py's purported promise to vary its terms. The integrated Operating Agreement forecloses her claim.

### 2. Pre-Operating Agreement Dilution

Manno claims that she was diluted unfairly before entering into the Operating Agreement. In that integrated contract, Manno unambiguously agreed that Manno Enterprises had a 14.5% member interest in CanCan. "If a writing is plain and clear on its face, i.e., its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent." *City Investing Co. Liquidating Trust v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993). Manno concedes that she signed the Operating Agreement. Schedule 1 of the Operating Agreement allocated a 14.5%

member interest to Manno. Having agreed to that allocation, she cannot now challenge it.[11]

### 3. Post-Operating Agreement Dilution

Manno claims that the dilution she suffered from capital calls after the execution of the Operating Agreement violated the terms of the Operating Agreement and constituted a breach of fiduciary duty. Neither claim succeeds.

The Operating Agreement gave CanCan's managers, acting with supermajority approval, broad discretion to set the terms of a capital call or other method of raising equity. Section 3.7 of the Operating Agreement authorized the

> [i]ssuing [of] additional Membership Interests, Economic Interests or any other equity, debt or other type of security, including the determination of the preferences, consideration to be paid for and other terms and rights of that interest or security, in their sole discretion . . .

> [with] (i) the approval of the Managers; and (ii) the affirmative vote or written consent, with or without a meeting, of a Member Supermajority.

OA § 3.7. The capital calls complied with this provision. The Operating Agreement also specified that in related party transactions, "the terms . . . must be as favorable as or comparable to those that [CanCan] could obtain from unrelated third parties." *Id*. § 4.3. Funding was not available from unrelated third parties.

---

[11] Moreover, to the extent that a 14.5% was marginally less than she owned before she executed the Operating Agreement, the reduction was not caused by RG Junior. As previously shown in Table 2, Manno's interest was reduced by 1.5% because McCulley received a 5% non-voting interest. It was Manno who borrowed money from McCulley, and McCulley had a claim against DK Suites. Only Manno benefitted from recharacterizing this claim as an interest in CanCan.

51

Once RG Junior gained control over CanCan, he owed fiduciary duties to the entity for the benefit of all of its equity holders. When RG Junior caused CanCan to make a capital call, he engaged in a self-interested transaction subject to entire fairness review. *See Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1115 (Del. 1994). Determining that the capital calls did not violate the terms of the Operating Agreement does not address the fiduciary duty question.

"When a transaction involving self-dealing by a [controller] is challenged, the applicable standard of judicial review is entire fairness, with the defendants having the burden of persuasion." *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (Del. 2012). "[T]he defendants bear the burden of proving that the transaction with the [controller] was entirely fair to the minority . . . ." *Id.* Once entire fairness applies, the defendants must establish "to the *court's* satisfaction that the transaction was the product of both fair dealing *and* fair price." *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995) (internal quotation marks omitted). "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the [controller's] beliefs." *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006). Fairness and flawlessness are two different things. "[P]erfection is not possible, or expected as a condition precedent to a judicial determination of entire fairness." *Cinerama*, 663 A.2d at 1179 (internal quotation marks omitted).

Table 3 identifies the post-Operating Agreement transactions and their effect on Manno's ownership percentage. Py accounted for the transactions that took place before

52

March 28, 2011, using the same simplistic method that he employed for the pre-Operating Agreement transactions, namely a reallocation of equal percentage interests from Manno and Py to RG Junior.[12] After RG Junior took control, beginning with the March 28 transaction, his investments were handled as capital calls that diluted all other owners proportionately.

| | | | | | |
|---|---|---|---|---|---|
| **TABLE 3** | | | | | |
| Transaction Date | Manno's Ownership | Implied Number of Total Units | Implied Number of Units Issued | Amount Paid | Implied Value Per Unit |
| Operating Agreement | 14.50% | 100 | N/A | N/A | N/A |
| 12/22/2010 | 13.50% | 107.41 | 7.41 | $400,000 | $54,000 |
| 1/14/2011 | 13.00% | 111.54 | 4.13 | $200,000 | $48,414 |
| 1/31/2011 | 12.50% | 116.00 | 4.46 | $200,000 | $44,828 |
| 2/9/2011 | 12.00% | 120.83 | 4.83 | $200,000 | $41,379 |
| 2/22/2011 | 11.50% | 126.09 | 5.25 | $200,000 | $38,069 |
| 3/28/2011[13] | 10.45% | 138.70 | 12.61 | $500,000[14] | $39,653 |
| 5/24/2011 | 9.50% | 152.57 | 13.87 | $500,000 | $36,050 |
| 6/27/2011 | 7.92% | 183.08 | 30.51 | $1,000,000 | $32,773 |
| 7/20/2011 | 6.60% | 219.69 | 36.62 | $1,000,000 | $27,311 |

Manno acquiesced in the transactions that reduced her interest to 11.5%.

> A claimant is deemed to have acquiesced in a complained-of act where he[]
> has full knowledge of his rights and the material facts and (1) remains
> inactive for a considerable time; or (2) freely does what amounts to

---

[12] As long as the only investors in CanCan were the operators (Manno and Py) and the financiers (the Granieris), Py's simplistic method served its purpose by diluting Manno and Py relative to the Granieris. Once the Operating Agreement credited McCulley with a 5% non-voting interest. Py's approach lumped McCulley with the Granieris and protected her interest as well.

[13] This investment and the three subsequent investments were made as capital calls. RG Junior actually funded each capital call with two separate payments. The date associated with each capital call reflects the date of the second payment, when RG Junior had paid the full amount.

[14] RG Junior provided $450,000. RG Senior provided $50,000.

recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved.

*Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1047 (Del. 2014). Manno wrote emails consenting to these transactions and signed amendments to the Operating Agreement confirming them. Manno also cannot challenge these transactions on grounds of *res judicata*. Manno could and should have raised these issues, if at all, in defense to CanCan's 2011 lawsuit seeking a declaratory judgment that Manno had been removed as a manager. *T.A.H. First, Inc. v. Clifton Leasing Co.*, 90 A.3d 1093, 1095 (Del. 2014) (holding that the effects of a default judgment include "preclud[ing] claims in a second action that should have been raised as counterclaims in the first action.").

Manno did not agree to the four capital calls that diluted her interest in CanCan from 11.45% to 6.6%, but RG Junior proved that these capital calls were entirely fair. RG Junior recognized that he had a fiduciary duty to treat Manno fairly, and he did everything he could to fulfill that duty. There were no disinterested managers or disinterested members who could make a decision about the financing transactions. CanCan urgently needed funding to continue operating, and RG Junior was the only possible source of funds. CanCan had sought third party financing, but none was available.

After consulting with his advisors, RG Junior decided to make the capital calls. By using that approach, he gave Manno the opportunity to participate on equal terms, preserve her membership stake, and even increase her stake by purchasing any interests that were not fully subscribed. RG Junior did not make overly large capital calls. Had he

done so, it might have appeared that by setting a high dollar figure, he was trying to prevent Manno from being able to protect herself. To size the capital calls, RG Junior relied on Toth to identify the amount of capital that CanCan required for short-term needs.

To price the capital calls, RG Junior decided to offer terms on the first capital call that were *more favorable to CanCan*–and hence more favorable to all non-participating investors—than the most recent transaction to which Manno had agreed. As shown in Table 3, the final transaction before the capital calls priced CanCan at $38,069 per implied unit. The first capital call priced CanCan higher—at $39,653 per implied unit. RG Junior could have demanded more onerous terms. CanCan was a highly speculative business, and there was no reason to believe that CanCan's value had improved from the earlier transaction. If anything, RG Junior had uncovered information indicating that CanCan was significantly less valuable. But he paid a higher price.

In the following three capital calls, RG Junior valued CanCan at the same price as the first capital call on a percentage basis. In the first capital call, CanCan had sold a 10% interest for $500,000. In the second capital call, CanCan again sold a 10% interest for $500,000. In the last two capital calls, CanCan sold a 20% interest for $1,000,000. From an implied-units perspective, this meant that each capital call became more expensive for CanCan and less expensive for RG Junior. In the second capital call, CanCan sold 13.87 units for $500,000. CanCan issued 10% more implied units than in the first capital call, but the price remained the same. The second capital call thus valued CanCan at $36,050 per implied unit. The last capital call valued CanCan at $27,311 per implied unit.

Although it would have been better to price the issuances at a constant price per unit rather than a constant price per percentage, RG Junior did not pick the marginally more dilutive structure disloyally or in bad faith. It was a mathematical detail that no one seems to have sussed out at the time. It also did not harm Manno. At most, she can complain that if RG Junior had priced the capital calls at a constant price per unit, then she would have held a 7.19% interest at the time of liquidation rather than a 6.60% interest. But the final result would have been the same when CanCan dissolved in either case. As discussed in Part III.C.5, *infra*, CanCan could not obtain funding and only could to satisfy a small fraction of RG Junior's liquidation preference. Its membership interests proved worthless. Manno would not have benefited from a 7.19% interest any more than she did from a 6.60% interest. Both were worth zero. Additionally, with the benefit of hindsight, there is also a sense of rough justice to the declining price per unit because CanCan's enterprise value was declining. CanCan needed RG Junior's additional investments just to keep the business going while Toth and his team uncovered and sought to remedy the various problems Manno had caused. CanCan was not using the money for net-present-value- positive projects.

The evidence at trial proved that RG Junior dramatically overpaid when making these investments. He did so to protect his large liquidation preference and in an effort to avoid litigation. His additional investments bought him time to explore CanCan's options and conduct an orderly liquidation. By keeping the insolvent business on life-support, RG Junior protected what little value remained. It was rational for him to overpay because his large liquidation preference meant that he would have the first claim on the assets. While

it is true that RG Junior priced his investments as if CanCan had positive equity value, the evidence at trial proved that it did not. RG Junior had a unique interest in CanCan that gave him reason to invest additional funds and risk throwing good money after bad.

Under the circumstances, the capital calls were entirely fair. They were necessary for CanCan to avoid immediate failure, made at a time when financing on comparable terms was not available from the market, priced comparably to similar transactions to which Manno had agreed, and valued CanCan well in excess of what it was actually worth. RG Junior testified credibly to the steps he took in an effort to be procedurally and substantively fair to Manno, and I credit his testimony. RG Junior did not breach his fiduciary duties by making the capital calls.

### 4. Usurpation Of A Company Opportunity

Manno next argues that RG Junior usurped a company opportunity by having Land Holdings purchase the Church Property. A fiduciary violates his duty of loyalty by usurping a company opportunity when (i) the entity is "financially able to undertake" the opportunity, (ii) the opportunity falls within "the line of the [entity's] business," (iii) the entity "has an interest or a reasonable expectancy" in the opportunity; and (iv) the fiduciary's interests conflict with those of the entity. *Guth v. Loft, Inc.*, 5 A.2d 503, 511 (Del. 1939). Manno's company opportunity claim fails to satisfy the first element.

CanCan lacked the resources to purchase the Church Property. CanCan did not have the money and could not raise it from third parties. RG Junior had no obligation to provide the financing. Because CanCan could not pursue the opportunity, Land Holdings did not usurp it.

57

Despite having the ability to pursue the Church Property free of any obligation to CanCan, RG Junior structured the purchase of the Church Property to be fair to CanCan. After Land Holdings bought the Church Property, RG Junior caused Land Holdings to grant a new option to purchase the Church Property to CanCan on better terms than the original option. RG Junior did this so that if Manno obtained financing for CanCan, then CanCan could take back the Church Property. Rather than harming CanCan, RG Junior left the company in a better position after the transaction.

### 5. Dissolution

Manno lastly challenges RG Junior's decision to dissolve CanCan and sell its assets to an entity he controlled. This is a textbook example of a transaction subject to entire fairness review. Although RG Junior had to shoulder a heavy burden to show that the transaction was entirely fair, he carried that burden.

A fiduciary can satisfy the entire fairness standard in a transaction where an interest holder receives nothing if the fiduciary proves that "there was no future for the business and no better alternative for the [interest] holders."[15] Here, the plaintiffs proved that Manno's interest in CanCan had no value at the time that the Granieris caused CanCan to dissolve.

---

[15] *Blackmore P'rs, L.P. v. Link Energy LLC*, 864 A.2d 80, 86 (Del. Ch. 2004); *see also In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 76 (Del. Ch. 2013) (holding that fiduciaries did not breach their duties in a transaction where an interest holder received nothing when the fiduciaries proved that the interest "had no economic value before the [transaction]").

58

The Granieris did not time the dissolution of CanCan to favor themselves or to prevent Manno from having time to obtain alternative financing. RG Junior had talked with Manno and Py about having another investor buy his interest in Fall 2010. He indicated this option was still open in January 2011. After firing Manno in February, RG Junior could have stopped providing any financing, which would have forced CanCan to shut down. Instead, RG Junior provided additional financing on fair terms.

RG Junior used the breathing room provided by the capital calls to search for third-party financing. In the summer of 2011, Cantor canvassed the market and determined that no third party would pay for equity in CanCan. This thorough, unhurried process provided a powerful indicator that the market did not attribute any value to CanCan's equity. *See Union Ill. 1995 Inv. Ltd. P'ship v. Union Fin. Gp., Ltd.*, 847 A.2d 340, 350 (Del. Ch. 2004) (Strine, V.C.) (A "real-world market check is overridingly important evidence of value."). CanCan would require substantial additional financing before it could build a business that would have value for its equity-holders. As noted, RG Junior had no obligation to provide the necessary additional financing.

In the notice for CanCan's final capital call on October 18, 2011, RG Junior informed Manno that CanCan had exhausted its search for third-party funding and would have no choice but to dissolve if it could not obtain additional funding from its members. He could have caused CanCan to simply declare that it would consider any reasonable funding offers from its members. Instead, he offered to fund 94% of the $25 million capital call. RG Junior knew that Manno had Flaum's backing by this point and therefore

had the ability to fund Manno Enterprises' $1.65 million share of the capital call. Flaum chose not to participate.

When the capital call failed, CanCan sold its assets to Land Holdings for $1,919,722.81. The evidence showed that the price paid by Land Holdings was at least fair and likely excessive. Land Holdings paid book value for a number of assets that had no value. In addition, one of the major reasons that CanCan's value was so low was because Manno breached her duty of loyalty and caused approximately $1 million in damages to CanCan. In addition, her acts of mismanagement that did not rise to the level of breaches of her duty of loyalty nevertheless caused CanCan to lose value.

RG Junior did not breach his fiduciary duties by causing CanCan to sells its assets to Land Holdings for $1,919,722.81 and dissolve. The evidence at trial established that CanCan's value at the time did not exceed the Granieri's liquidation preference and had no reasonable prospect of ever doing so. As noted, contemporaneous indications of value include Cantor's inability to find an equity investor and Flaum's unwillingness to fund the capital call. Another probative indictor is that when UBS raised financing for the smaller and superior Scarlet Pearl project in 2014, RG Junior had to write the equity check himself and provide a personal guarantee.

At the time of dissolution, CanCan had no funding sources and no alternatives. Its equity had no value. RG Junior acted in a manner that was entirely fair.

## C. The Contract Claims

In the summer of 2010, RG Junior agreed to buy a 2.5% interest in CanCan from Manno Enterprises in return for $300,000. RG Junior acknowledged that he owed Manno

60

Enterprises the remaining $130,000. That amount remains outstanding. RG Junior is liable in contract to Manno Enterprises for $130,000.

In March 2011, RG Junior and Manno agreed that she would end her relationship with CanCan and Manno Enterprises would sell its remaining member interest in CanCan in return for an immediate payment of $30,000 plus additional consideration. On behalf of CanCan, RG Junior paid Manno $30,000. Manno and Manno Enterprises breached the settlement agreement by failing to perform. CanCan has not sought specific performance. Instead, CanCan seeks to recover the $30,000 it paid to Manno. As damages for breach, Manno and Manno Enterprises are jointly and severally liable to CanCan for $30,000.

**D. Setoff**

The plaintiffs ask that any liability on their part be offset by the defendants' liability in this case and the award of attorneys' fees in the prior default action. *CanCan*, 2011 WL 4379064. Setoff is permissible when "equity and good conscience require it to be made, substantial justice will be promoted thereby, and the rights and interests of third persons will not be infringed." *Pettinaro Constr. Co., Inc. v. Lindh*, 428 A.2d 1161, 1164 (Del. 1981). RG Junior's $130,000 liability to Manno Enterprises may be partially offset by Manno Enterprises' $30,000 liability to the plaintiffs for breach of the settlement agreement plus the award of costs in this action. However, Manno Enterprises neither is liable for the $970,123 in damages for Manno's breaches of fiduciary duty nor was it liable on the default judgment from the prior action. Manno Enterprises is therefore a third party whose rights would be infringed by offsetting Manno's debts against its claim.

## III. CONCLUSION

The plaintiffs did not breach their fiduciary duties or violate the Operating Agreement. Manno breached her duty of loyalty to CanCan and is liable in the amount of $970,123. Net of a $30,000 setoff, RG Junior is liable in contract to Manno Enterprises for $100,000. The parties will submit a proposed form of final order that includes an award of costs to plaintiffs, which shall be treated as a further setoff to RG Junior's liability.